## Case No. 4,614.

### FAIRFAX v. HOPKINS.

[2 Cranch, C. C. 134.] [1]

Circuit Court, District of Columbia. May 17, 1817.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

Mr. Jones, for complainant.

Mr. Swann, for defendant.

Before CRANCH, Chief Judge, and THRUS-TON and MORSELL, Circuit Judges.

CRANCH, Chief Judge (MORSELL, Circuit Judge, doubting). The facts of this case appear to be as follows:—On the 27th of September, 1811, Ferdinando Fairfax, being indebted to John Hopkins in the sum of $7,294, made a deed of trust to B. Taylor and T. Parker, for twelve hundred and sixty-seven acres of land in Jefferson county in Virginia, with power to them or either of them to sell the same for ready money to the highest bidder, after giving two months' notice of the time and place of sale in the newspaper printed in Charleston, in case F. F. should not pay the debt on the 1st of October, 1812. Mr. F. failed to pay on that day, and on the 9th of the same month the property was advertised for sale under the trust. At the sale there was no real bidder but Mr. Turner the agent of Mr. Hopkins. Mr. Humphreys and Mr. Dixon admit that they had not the money. Their bids therefore would not have been received. The land was, of course, struck off to Mr. Turner for Mr. Hopkins, at the price of $5,320. Mr. Hopkins, in his letter to Mr. Turner, of the 13th of November, 1812, admits that the land was good security for the debt, and authorized Mr. Turner to bid to the full amount of the debt, interest, costs, and commissions. On the 13th of April, 1813, B. Taylor, one of the trustees, conveyed the land directly to Mr. Hopkins. After crediting the purchase-money, ($5,320) the balance stated to be due to Mr. Hopkins was $2,780.95, for which he brought suit on the bond. Mr. Fairfax was arrested and not being able conveniently to give bail, made another deed of trust, in lieu of bail (not admitting any thing to be due) for two hundred and fifty acres of land in Loudon county. Judgment was recovered, and not being satisfied, the trustees of the Loudon land advertised it for sale at Leesburgh, on a court day. Only two bids were made; one by some person, as it seems, merely to set it up, at $5 an acre; the other by Mr. Hopkins, Jr., in behalf of his father, to whom it was struck off at $6 an acre. The only real bidder was Mr. Hopkins. The proceeds of this sale being credited ($1,500) Mr. Hopkins took a ca. sa. against Mr. Fairfax for the balance, being about $1,900. Mr. Fairfax filed this bill and obtained an injunction, which it is now moved to dissolve, upon the coming in of Mr. Hopkins's answer. Mr. Hopkins admits that he has sold these last 250 acres of land, at about 10 dollars per acre, and that for the Jefferson land remaining unsold, being about 1000 acres, he would take the same price at long credits. Without taking into account the 267 acres of Jefferson land, which Mr. Hopkins has sold, he has 1000 acres worth 10 dollars an acre, 10,000 dollars, and has sold the Loudon land for about 2,500 dollars, making 12,500 dollars. The whole debt and interest to the 27th of September, next, would be a little less than 10,000 dollars, so that he has already received 2500 dollars more than his whole debt and interest. If we add the 267 acres of Jefferson land sold by Mr. Hopkins, perhaps at 10 dollars, it will make upwards of 5000 dollars more than the whole debt and interest.

A mere statement of the facts of this case show its injustice. That a creditor should have the power of appropriating to himself, at his own valuation, the property of his debtor, strikes every one as unjust in the extreme, yet this has been the fact in the present case, and may be the fact in many like cases, if, by mere compliance with exterior forms, we can tie the bandage of law over the eyes of equity. In the present case, although the forms of the contract may have been pursued, so that, if a stranger had been the purchaser, his title would have been protected at law, yet, in substance, as between these parties, the contract has not been complied with. The land was to be sold to the highest bidder; meaning, unquestionably, the highest bonâ fide bidder; and unless there be at a sale, more than one such bidder, the sale cannot be made to the highest bidder; because where there is only one there can be no comparison. The word "highest" was used in order that there should be no sale unless there should be a real competition. Such is undoubtedly the intention of the parties; and where the intention of the parties has not been fairly executed, a court of equity will interfere in cases where third persons have not acquired legal rights without notice of the equity. In the present case the rights of third persons do not interfere. The transaction has been entirely between the debtor and creditor. The creditor has, under the forms of law, appropriated to himself, at his own valuation, the property pledged. He has stood by and seen the property of his debtor sacrificed in consequence of his own pressure, and has even taken to himself the whole benefit of that sacrifice. He has gained all that his debtor has lost. Not contented with this he seizes the body of his debtor, and when his debtor asks a court of equity to look into his case, the creditor presents to the court his shield of legal forms. We are told in the answer that we cannot question either the legality or the equity of the sale of the Jefferson lands, because that subject has been acted upon by the chancery court at Winchester. This may be so as it respects the title to those lands. The creditor may keep them, and perhaps his title may be

unquestionable by this court. But this court is not bound, while inquiring whether the creditor shall be permitted further to prosecute his debtor, to shut his eyes to the facts in evidence before us. We are not forbidden to see that the creditor has, in fact, appropriated to himself those lands which he admitted to be good security for his debt; nor that he has also acquired other lands of his debtor at a very inadequate price. If those lands were good security while in the hands of the debtor, why should they not, in equity, be considered as good payment when they get into the hands of the creditor? We are not forbidden to see that the debt is in fact paid which the creditor seeks to enforce. We may not perhaps set aside the conveyance of the property to the creditor; we may not, perhaps, on final hearing, compel the creditor to account for a surplus, but we think we ought to continue the injunction till final hearing. It may then be time enough to inquire whether we can decree a perpetual injunction. In cases like this, the trustee appointed by the parties is substituted for a master in chancery under the decree of a court of equity. The one is as much bound as the other, not only to see that the sale is fairly made, that is, that no fraud or deception be used, but to ascertain that there is a real competition; not a mere sham sale. He is not to suffer a creditor to bring with him a few nominal bidders, for the purpose of enabling him to take to himself the property at his own price; he is as much bound to take care of the interest of the debtor, as of the creditor; and if he finds only sham competitors, he ought not to proceed with the sale; but adjourn and give new notice. For these reasons the opinion of a majority of the court is that the injunction should be continued till final hearing.

At November term, 1818, the cause having been set for hearing, on the same evidence, THE COURT (THRUSTON, J., absent) decreed the bill to be dismissed—that being the opinion of MORSELL, Circuit Judge—and CRANCH, Chief Judge, doubting as to the conclusive effect of the decree of the court of chancery in Virginia.