CASE 77.—MANDAMUS BY THE LOUISVILLE HOME TELE-
PHONE COMPANY ·AND ANOTHER AGAINST THE
CITY OF LOUISVILLE AND OTHERS.—November 20,
1908.

# Louisville Home Telephone Co. v. City of Louisville

Appeal from Jefferson Circuit Court (Common
Pleas Branch, Second Division).

Thos. R. Gordon, Judge.

Judgment for defendants. Plaintiffs appeal.—Re-
versed.

1. Mandamus—Nature.—"Mandamus," as defined by Civil Code
Prac., section 477, and the courts, is a writ commanding the
performance of some duty, in the performance of which the
applicant for the writ is interested, or by the nonperform-
ance of which he is aggrieved or injured.

2. Persons Entitled to Relief.—A private person, who shows a
direct and special interest in himself, may apply for a writ
of mandamus to enforce a public duty, though the public
may be affected, and it may be the duty of the common-
wealth or the public, through its officers, to act in the
matter.

3. Mandamus—Rights to be Enforced.—Mandamus cannot be
maintained, unless there is a legal right in the applicant for
the writ and a corresponding duty imposed on the respondent.

4. Nuisance—Public Nuisances—Rights and Remedies of Private
Persons.—A private individual can enjoin or recover damages
for a public nuisance when he shows injury distinct from
that suffered by the public.

5. "Direct and Special Interest."—The "direct and special in-
terest" of a private individual which entitles him to apply for
mandamus to enforce his private right in the performance
of a public duty must be independent of and distinguishable
from that which obtains to him in common with the general

public, though it may be necessary that such particular interest should be different in kind from that of the general public or peculiar to the individual alone.

6. **Persons Entitled to Relief.**—An application by private individuals for mandamus to compel a city's executive board to advertise and sell a telephone franchise as directed by an ordinance providing therefor, which avers that the applicants are taxpayers, and that one of them, who owns an existing franchise, expects to purchase the new franchise, without any showing as to how their property or other legal right, or the city's property or revenue, are injured by the refusal to sell the franchise, does not show that the applicants have such private right as entitled them to the writ.

7. **Proceedings—Parties.**—Mandamus to compel a city's executive board to advertise and sell a telephone franchise as directed by an ordinance providing therefor involves the enforcement of a public duty, and a private individual, who is a citizen and a resident, engaged in business in the city, and, as such, interested in the execution of the law, is a proper relator to institute such proceedings for the public, when the city attorney or other representative of the Commonwealth fails to act in the matter.

8. **Appeal—Grounds of Review.**—The objection that relators, in a mandamus proceeding for the public, did not proceed in the name of the Commonwealth cannot be raised for the first time on appeal.

9. **Proceedings—Parties.**—An objection that relators, in a mandamus proceeding for the public, did not proceed in the name of the Commonwealth may be obviated by an amendment.

10. **Municipal Corporations—Use of Streets.**—An ordinance charging the board of public works with the duty of advertising and selling a telephone franchise provided for in the ordinance, is within the power of the city council.

11. **Grant of Franchises.**—A municipality has the power to maintain and operate plants, and use the public streets for furnishing public utilities, such as water, light, and telephone service, for itself and to its inhabitants, and it may discharge such power by others, upon such terms as may be agreed upon in the form prescribed by law.

12. **Franchises—Nature of Right.**—What is commonly termed the "granting of a franchise by a city for a public utility, such as a telephone franchise, is in the nature of a contract by the city with the grantee for the performance of a public service, and the primary object is not the revenue to be

obtained for the city, but the securing of efficient service upon such terms as will promote the greatest good.

13. Monopolies—Validity of Grants—Franchises.—That an ordinance for the public sale of a telephone franchise to the owner of an existing franchise eliminates the owner of another franchise as a bidder at the sale does not render it repugnant to Const. section 164, prohibiting monopolies; the purpose of the ordinance being to preserve effective competition.

14. Municipal.Corporations—Debts—Release—Grant of Franchises —Validity.—The relation between a city and the owner of an existing telephone franchise being quasi contractual for the performance of a service, an ordinance modifying the terms of the franchise for the purpose of securing more effective service in competition with the owner of another franchise is not invalid as releasing an indebtedness or liability to the municipality in violation of Const. section 52.

HELM & HELM, HELM, BRUCE and KOHN, BAIRD, SLOSS & KOHN for appellants.

A. E. RICHARDS, A. B. BENSINGER, and DODD & DODD for appellees.

No briefs. Record out of office.

OPINION OF THE COURT BY SPECIAL JUDGE D. W. LINDSEY—Reversing.

The case presented by the record is an application by the Louisville Home Telephone Company and John Coleman against the city of Louisville and certain named persons, who constitute the "board of public works" of said city, for a writ of mandamus to compel such "board of public works" to advertise and sell at public sale a certain telephone franchise in said city, claimed to have been provided for, and its advertisement and sale directed to be made by such board, by an ordinance of the general council of said city, alleged to have been duly passed by both boards of the general council of said city, and to have become oblig-

atory without the mayor's signature on May 26, 1908. The plaintiffs or applicants, as required by sec. 474, Civil Code of Practice, filed a petition stating the cause and ground of the application, to which the defendants or respondents filed general demurrers, and, not waiving the demurrers, also filed answers.

The demurrers to the petition raise primarily the question whether or not the facts stated in that pleading show a right in the applicants to the writ against the appellees, the members of the "board of public works." The question may be considered from two aspects, the one as to the right of the appellants, under the facts, to sue for and obtain the writ, and the other as to the liability, so to speak, of the appellees, constituting the board of public works, to the writ. It is contended for the appellants that they are proper applicants for the writ, not only because of their private right in the relief sought, but also because there is involved a public right, and the object is the enforcement of a public duty. Obviously the determination of the questions presented involves the consideration of the nature and purpose of the writ of mandamus, the character of the right of the applicant entitling him to obtain it, and against whom the writ may issue. Mandamus is, by section 477, Civil Code of Practice, thus defined: "The writ of mandamus, as treated of in this chapter, is an order of a court of competent and original jurisdiction, commanding an executive or ministerial officer to perform an act, or omit to do an act, the performance or omission of which is enjoined by law; and is granted on the motion of the party aggrieved, or of the Commonwealth when the public interest is affected." This statutory definition does not differ materially from those given by the law writers and the courts. Ency.

P. & P., vol. 13, p. 487; Legg v. Annapolis, 42 Md. 203. In the case just mentioned the court concisely said: "It is a writ commanding the performance of some act or duty, therein specified, in the performance of which the applicant for the writ is interested, or by the nonperformance of which he is aggrieved or injured." It is evident, then, that there must be some right which is affected by the performance, or nonperformance, of the act sought to be compelled or restrained; and, if that right is in the public, and the object is the enforcement of a public duty, the Commonwealth, or the public in some form, should be the applicant for the writ, but if the right to be affected be merely that of a private person, that person must be the applicant, and that the performance, or nonperformance, as the case may be, of the act must be a duty which the law enjoins upon the respondent to the writ.

As to the interest required on the part of an individual to make him a proper party to apply for such writ, there is some conflict in the authorities. In Ency. P. & P., vol. 13, p. 630, the author writes: "In the greater number of States it is held that a private relator applying for a writ of mandamus must show some special interest in himself." While in the extended note to the case of Dane v. Derby, reported in 89 Am. Dec., the annotator, on page 471, says: "The doctrine supported by the great weight of authority is that, where the relief sought is merely private, the relator must show some special interest in the matter; but, when the question is one of public right, and the object the enforcement of a public duty, he need not show that he has any special interest in the result. It is in that case sufficient for him to show that he is a citizen, and, as such, interested in the execution of the

laws (citing authorities). Other courts hold that the relator must show a special interest in the subject-matter of the proceedings." And in Ency. P. & P., vol. 13, p. 632, it is said: "In some instances a distinction has been made between public duties due the State in its sovereign capacity and those public duties affecting all, or a large number, of the citizens. When the duty is of the latter kind, it is held that a private citizen may be the relator in a mandamus proceeding to enforce it"—citing, among other authorities, the case of Union Pac. R. Co. v. Hall, 91 U. S. 343, 23 L. Ed. 428. In the case last mentioned the Supreme Court wrote: "There is, we think, a decided preponderance of American authority in favor of the doctrine that private persons may move for a mandamus to enforce a public duty, not due to the government as such, without the intervention of the government law officer." It is, we think, definitely settled by the decisions of this court that, though the public interest may be affected, and it may be the duty of the Commonwealth or the public, through some of its agencies, to act in the matter, yet, a private person, who can show direct and special interest in himself, may apply for and obtain a writ of mandamus. Hammar v. City of Covington, 60 Ky. (3 Metc.) 494; Trustees of Catlettsburg v. Kinner, 76 Ky. (13 Bush.) 334; Register Newspaper Co. v. Yeiser, 117 Ky. 1013, 80 S. W. 478, 25 Ky. Law Rep. 2186; Merchants' Police, etc., Co. v. Citizens' Tel. Co., 123 Ky. 90, 93 S. W. 642, 29 Ky. Law Rep. 512.

As to the character of right entitling an applicant to the writ of mandamus, the authorities are to the effect that it must be a clear, complete, and existing legal right. Ency. P. & P., vol. 13, pp. 496, 497; Cyc., vol. 26, pp. 151, 153, 154. Or in the language of this

court: "Mandamus can not be maintained unless there is a legal right in the appellant, and a corresponding duty imposed by law on the appellee." Lowe v. Phelps, Judge, 77 Ky. (14 Bush) 647. When it is considered that the public rights and duties enforceable by mandamus are of such great variety, and that the measure of the interest of a private individual therein to entitle him to invoke that remedy must, of necessity, largely depend upon the nature of the right or duty sought to be enforced in each particular case, it is readily seen why the authorities have not, and possibly can not, lay down any general rule as to what constitutes an interest sufficient to entitle a private individual to institute mandamus proceedings to enforce a public right or compel the performance of a public duty.

In each of the cases of Catlettsburg v. Kinner and Hammar v. Covington, supra, the effect of the holding, in an opinion by Lindsay, Chief Justice, was that abutting property holders on a public street, by reason of their peculiar and particular right in the use of the street as a means of ingress and egress to and from their properties, and the apparent danger to their properties, distinguishable from the right in the general public to the use of the street as a highway, had such direct and special interest as entitled them to a writ of mandamus to compel the preservation and repair of the street by those upon whom the law placed that public duty.

The case of Register Newspaper Co. v. Yeiser, supra, cited in the brief of counsel, was where the newspaper company was, by due selection and appointment, the official newspaper of the city of Paducah, and as such was required and entitled to publish, at its regular rates for advertising, all ordinances, reso-

lutions, notices, etc., which, under the charter or ordinances of the city, were required to be published. There were certain delinquent tax lists, which the law required should be sold at public auction, the lists and the notice for the sale thereof to be published for at least two weeks in the city's official newspaper. The city official charged with the duty of furnishing such lists and notice for publication failed and refused to do so. This court held that the Register Newspaper Company could, by mandamus, compel the city's official whose duty it was to furnish the delinquent tax lists and notice of sale for publication. Thereby, in effect, holding that the newspaper company had direct and special interest in having for publication and advertisement the delinquent tax lists and the notice; such interest being clearly its legal right to advertise the lists and the notice for their sale, and to receive therefor pay at its regular rates for advertising.

The case of the Merchants' Police & Telegraph Company v. Citizens' Telephone Company, supra, was where the appellee had a telephone franchise, obtained from the city in accordance with the provisions of section 164 of the Constitution, and appellants did not purchase a telephone franchise as provided by that section of the Constitution, but was operating its telephone plant in the city without authority of law; under an attempted grant to it by the city council, which, being void, conferred no right whatever. This court held that the appellee, as a citizen and taxpayer of the city, had the right by action to put an end to the wrong so perpetrated by the council, by stopping appellant from further acting under the illegal grant. Why? The court in the opinion gives the answer. The appellee was interested, as was each and every other taxpayer, in preventing loss to the city by the illegal gift

of a valuable franchise, which, if sold, would increase
the city's revenues and thereby lessen the amount
necessary to be raised by taxation.

The relation of private individuals to common or
public nuisances may be referred to as analogous to
the question being considered. This court has repeat-
edly held that private individuals can enjoin, or sue
to recover, damages for an act constituting a common
or public nuisance when they show that they will
receive, or have received, injury distinct from that
suffered by the public. Gleason v. Schneider, 7 Ky.
Law Rep. 834; Maysville & Mt. Sterling T. P. Co. v.
Ratcliff, 85 Ky. 244, 8 Ky. L. R. 933, 3 S. W. 148; Beck-
ham, etc., v. Brown, etc., 40 S. W. 684, 19 Ky. L. R. 519.
The rule deducible from these and kindred cases from
this court, and sustained, we think, by the weight of
authority at large, is that the "direct and special
interest" of a private individual, which would entitle
him to apply in his own behalf for and obtain a writ
of mandamus to enforce his private right, must be
independent of and distinguishable from that which
obtains to him in common with the general public or
to the mass of the community; though it may not be
necessary that such particular interest should be dif-
ferent in kind from that of the general public, or
peculiar to the individual alone.

In the case here in hand the "cause and ground"
of the application are the averments, in substance, as
follows: That each of the applicants is the owner of
real and personal property in the city, a taxpayer to
the city, and engaged in business therein; that the
applicant John Coleman is a citizen and resident of the
city, and the applicant the Louisville Home Telephone
Company is the owner and operator of a telephone
plant in said city; that the ordinance exhibited was

duly passed, etc., and became obligatory without the signature of the mayor; that by the terms of such ordinance it is made the duty of the "board of public works" of the city of Louisville to advertise and sell the franchise (in the ordinance provided) for the acquisition and operation of a telephone system in the city; that the applicants have demanded of the defendants, named as the board of public works of the city, "to proceed with the advertisement of sale, and with the sale, and have also demanded of the city, through its chief executive officer, the mayor thereof, to cause said advertisement to be made, but said defendants have refused thus to proceed, and have announced that they do not intend to advertise or sell said franchise;" and that "plaintiff the Louisville Home Telephone Company has a special interest in the sale of said franchise, because it expects and intends to become a bidder for said franchise, when sold by the 'board of public works,' and hopes to become, and believes it will become, the purchaser thereof, and it desires to have the opportunity of thus acquiring the franchise for the operation of a telephone plant in the city of Louisville, in accordance with the terms set forth in the ordinance." Under the rule above stated, do these, the only facts alleged as the "cause and ground" of their application, show any "direct and special interest" in appellants, separate and apart from the general public, in having the telephone franchises contemplated by the ordinance advertised and sold? It is insisted by counsel in argument that they do, because it is alleged that the applicants each are taxpayers to the city, and cite as authority for the contention the cases, above referred to, of Register Newspaper Co. v. Yeiser, and Merchants' Police & Telegraph Co. v. Citizens' Telephone Co. In the first-

mentioned of these cases there was no claim of right because the newspaper company was a taxpayer, or a citizen of, or engaged in business in, the city; but, as stated above, the ''direct and special interest'' of that company was by reason of its contract right to do the advertising and receive the compensation therefor. In the other case this court held that the party applicant, a taxpayer, was directly interested to prevent loss to the city by an illegal gift of a valuable franchise, which, if sold legally, would increase the city's revenue, and thereby lessen the amount necessary to be raised by taxation.

Here, in the pleading being considered, no averment is made as to how, or fact stated by which, it is made to appear that appellants' property or other legal right, or the property or revenue of the city, are injuriously affected by the failure and refusal of the appellees, constituting the board of public works, to advertise and sell the franchise. It is not even alleged that the sale of the franchise would be of pecuniary benefit to the city. It may be argued that, if the franchise be sold, to the extent of the purchase price it brings, the revenues of the city would of necessity be increased, and that thus, under the authority of the case of Merchants' Police & Telegraph Company v. Citizens' Telephone Company, the ''definite and special interest'' of appellants as taxpayers is manifest. But is it true, or is it correct to assume, that by the sale of this franchise, under the terms of the ordinance exhibited, the revenues of the city would of necessity be increased? It appears from the application, and the ordinance exhibited and made part thereof, that the applicant the Louisville Home Telephone Company is now conducting a telephone plant under a franchise purchased from the city, which franchise

has yet some years to run, and under the terms of this ordinance, if it becomes the successful bidder for the franchise, the sale of which is now sought to be compelled. then the former franchise is to be void, and all obligations to the city thereunder be also void. And the averment in the pleading being considered is that it, the Louisville Home Telephone Company, "expects and intends to become a bidder for said franchise * * * and hopes to become, and believes it will become the purchaser thereof." Such being the situation, it will readily be seen that it is altogether problematical as to the effect the proposed sale of the franchise. if consummated, would have upon the revenues of the city. But the pecuniary advantage is not the only, or the most important consideration in matters like those here under consideration. Efficient and reliable service, at reasonable rates, is far more important, and is the direct object to be obtained rather than the mere purchase price. We do not think that the appellants have by their pleading shown in themselves such private right as entitled them to obtain the writ in this case.

However as has been stated, the appellants contend that, even if they have not the requisite mere private right to entitle them to the writ sought in this proceeding. they, being citizens and residents of, and engaged in business in. the city, and as such interested in the execution of the law, have the right as relators to bring the matter before the court. Clearly the ordinance exhibited with the petition imposes upon the board of public works of the city of Louisville the duty of advertising and selling at public sale the telephone franchise in the ordinance provided. In this day efficient telephone service is so essential not only in the conduct of private business in the cities, as well

as in the rural districts, but is also so important in the management and conduct of the business and government of cities, that its proper installation and maintenance and service constitute a matter of decided public interest. The question in this case is therefore one of public right, and the object is the enforcement of public duty. And, as we have seen from the authorities quoted supra, in such state of case a relator in a mandamus proceeding need not show that he has any special interest in the result, but it is sufficient for him to show that he is a citizen and resident, and engaged in business in the city, and as such interested in the execution of the law, and that, inasmuch as the public duty here sought to be enforced is not one due to the State in its sovereign capacity, the decided preponderance of American authority is that private persons may move for a mandamus to enforce such public duty. 13 Enc. P. & P. 632; Union Pac. R. Co. v. Hall, 91 U. S. 343, 23 L. Ed. 428; State v. Weld, 39 Minn. 426, 40 N. W. 561; Chicago, etc., R. Co. v. Suffern, 129 Ill. 274, 21 N. E. 824. It is true that the Code provision is that the writ of mandamus is granted on the motion of the Commonwealth when the public interest is affected. And it is usual for the Commonwealth or the public to take action in such matters through its selected officer. But there is no such limitation in the statute. And in the present case the fact that the officer, whose duty it is usually to enforce the public's rights in the city, and represent the same in the courts, is, in the performance of his official functions as adviser of the city officials, and with unquestioned good faith upon his part, placed in the adverse position of attorney for the respondents in this application, raises the question, Does the failure or refusal

of the city attorney, or other representative of the Commonwealth, to seek the enforcement of this public duty preclude its enforcement?

The facts in the case of People ex rel. Ayres v. State Auditors, 42 Mich. 428-430, 4 N. W. 274, were, in many respects, similar to the case at bar. There a State statute, it was contended, imposed upon the State Auditors the duty of advertising for and receiving proposals for printing the decisions of the supreme court of that State. The auditors thought the statute not operative at the time. The relator was, by reason of his being engaged in the business of printing, etc., a competent bidder, and desired to become a bidder for the printing and publishing of the reports. It being claimed by the respondents that if they had done any wrong they were guilty of a public wrong, and not a private wrong, and that only the representative of the State could complain of their misconduct, the question arose whether the court would allow a private relator to complain of the alleged omission of duty. The court said in part: "In the present case the officer whose duty it usually is to enforce the rights of the State in this court, in the performance of his official functions as adviser of the State officers, placed himself in an adverse position, and appears for the respondents on this application. Inasmuch, then, as the Attorney General refuses to appear and seek the enforcement of the statutory provision, does his refusal preclude its enforcement? And if not, is the relator authorized to bring the matter before this court? There may perhaps be others who have interests that would justify their appearance, but there is no one else whose duty it is to appear where the Attorney General declines to do so. It can not be said that relator has any greater legal interest

than other citizens, if the application must be made by an interested party. But if any party not actually interested may become relator or reformer, then the fact that he is engaged in business which would make him a competent bidder, and that he desires to become a bidder if the interest is set up for competition, removes him from the position of an officious interloper, and gives sufficient assurance that the controversy is genuine and in good faith. The rule which rejects the intervention of private complainants against public grievances is one of discretion, and not of law. There are serious objections against allowing mere interlopers to meddle with the affairs of the State, and it is not usually allowed, unless under circumstances where the public injury by its refusal will be serious. In the cases of People ex rel. Drake v. Regents of the University, 4 Mich. 98, and People ex rel. Russell v. Inspectors of the State Prison, Id., 187, the court took pains to guard against any decision that would prevent complaint by a private relator where the public interests require prompt action, and where the public prosecutors will not interfere. There is, as there shown, more liberality in some States than in others. But we find no reason to consider the matter as one lying outside of judicial discretion, which is always involved in mandamus cases concerning the relief as well as other questions.''

It may be urged that, even if the appellants are proper relators to institute this proceeding for the public, they should, under the statute, have proceeded in the name of the Commonwealth, as the representatives of the public by them as relators—a form of procedure used in the case last above quoted from. That is a matter of procedure only, objection to which was not made by special demurrer in the court below,

where, if deemed necessary, it might have been changed by amendment; and the point should not be regarded in this court. And it seems that in the case of Union Pac. R. Co. v. Hall, supra, which had the sanction of the Supreme Court, the form of procedure adopted in this case was used. Concurring in the rule announced by the authorities above cited, this court is of the opinion that the appellants are proper relators in behalf of the public, to apply for the writ of mandamus sought in this case. The enactment of an ordinance of the character of the one presented here was clearly within the province and power of the general council of the city. It was for that body in its discretion to determine, and in such form to promulgate, whether it would sell the franchise, and the terms upon which it should be sold; and it was entirely proper for it, in the ordinance, to charge the board of public works, the city's executive board having charge of and supervision of the use made of the streets and public ways of the city, over which and through which the franchise would have to be exercised, with the duty of advertising and making the public sale as directed.

In considering the demurrer to the petition, it remains to be seen if the ordinance contravenes the Constitution in the particulars suggested in argument. It is contended for the appellees that the ordinance is in violation of section 52 of the Constitution, which reads: "The General Assembly shall have no power to release, extinguish or authorize the release or extinguishing in whole or in part the indebtedness or liability of any corporation or individual to the commonwealth, or to any county or municpality thereof." The proposition advanced by appellees' counsel is that the published ordinances of the city—of which this court must take notice—show that the appellant tele-

phone company is now operating in the city under a franchise legally obtained, by the terms of which the company is required to pay annually to the city the sum of $1 for every telephone service or instrument in excess of 6,000, and to furnish telephone service at certain stipulated rates. And this, it is argued, constitutes a contract liability, from the company to the city, which the latter is powerless, under the section of the Constitution quoted, to release, that by the terms of the ordinance here involved the appellant telephone company is permitted to become a bidder for the franchise to be sold, and expects to become the successful bidder therefor, and in the event that it does become the purchaser of the present franchise, under which it is now operating, is to "become null and void, and be forfeited and surrendered to the city of Louisville, and all obligations created by the ordinance granting the same, or acceptance thereof, shall immediately cease and determine," and that by this ordinance the telephone rates are materially increased, which will, it is claimed, operate to release a liability from the telephone company to the city. It does not appear from the petition that the company is indebted to the city at present in any amount, or that the company has installed any telephone service or instruments in excess of the 6,000. But it is stated in the brief of counsel, as alleged in the answer, that under that provision in the franchise now being operated under, the city is receiving annually over $2,000, and the franchise has over 30 years to run. It is also contended that the ordinance here involved contravenes section 164 of the Constitution. The ground of this contention is not made plain, further than it is argued that, because the Bell system of companies, of which the Cumberland Telephone & Telegraph Company, now legally operat-

ing in the city, is a constituent member, is excluded as a competitive bidder, a sale of the franchise under the ordinance will not be a public sale within the meaning of the section of the Constitution indicated.

In considering these two propositions it may, we think, be proper to view the relation of a municipality to public utilities such as water, light, and telephone service. Because of their potency and usefulness in promoting and preserving the health, security, and comfort of the public, and of the aid they afford in the conduct of the business and administration of the municipality itself, such utilities have long been regarded as essential governmental agencies and important aids to the police power. A municipality has the power and right to erect, maintain, and operate plants, and use the public streets for furnishing such utilities for the municipality itself and to its inhabitants. Such power or duty it may discharge by having others perform them for it upon such terms as may be agreed upon in the form and manner prescribed by law. What, therefore, is commonly termed the "granting" of a franchise by a city for one of these public utilities is in the nature of a contract by the city with the grantee for the performance of a public service. Such, in part at least, seems to have been the view of this court in the opinion in the case of Cumberland T. & T. Co. v. City of Hickman, decided June 10, 1908, 129 Ky. 220, 33 Ky. Law Rep. 730, 111 S. W. 311, wherein the court, in speaking of a telephone franchise, said: "This right which is most akin to a right of way, is the subject of grant, which partakes, in turn, of the nature of a contract." From this view of the subject it will readily be seen that the primary object a city would have, in contracting for or procuring the service of such utilities, is not the revenue to be

obtained for the city, but the securing of good and
efficient service, and upon such terms as will, in the
judgment of the city's governing body, promote the
greatest good, not alone to those who use the utility,
the telephone for instance, but to the entire commun-
ity, including the city government.   For obtaining the
end just mentioned, the value of competition in such
service to the public is not only recognized, but is
emphasized, by this court in Stites v. Norton, 101
S. W. 1189, 125 Ky. 672, 31 Ky. Law Rep. 263,
15 L. R. A. (N. S.) 474, where it was held that it was
the duty of the city to establish a competing plant. In
that case, as in this, the owner of a then existing fran-
chise was eliminated as a bidder at the proposed sale.
This court then said: "This duty was of equal dignity,
and as binding upon it (the city) as that of selling
the franchise to the highest and best bidder, and it
had the right, in our opinion, to so frame the ordinance
as to accomplish the purpose of obtaining a competing
plant."   And again, further on: "Section 164, as con-
strued, is but a part of the general scheme of the Con-
stitution to prohibit and break up monopolies."   And
we may say in this case that to make competition
effective, and in such form preserve it, is as much a
duty as to establish it.   And as such seems to be
the plain purpose in this ordinance, we do not think
the ordinance is repugnant to section 164 of the
Constitution.

The relation between the city and the appellant
telephone company being, as we have seen, quasi con-
tractual and for the performance of a service, can it be
said that section 52 of the Constitution, above quoted,
prevents the city, with the consent of the company,
from so modifying the terms for such service as will,
in the judgment of the city's governing body, permit

and secure effective service in competition with the Cumberland Telephone & Telegraph Company? We do not think so. This section of the Constitution was before this court for construction in the cases of City of Louisville v. Louisville Ry., 111 Ky. 19, 63 S W. 14, 23 Ky. Law Rep. 390, 98 Am. St. Rep. 387; Commonwealth v. Tilton, 111 Ky. 342, 63 S. W. 602, 23 Ky. Law Rep. 53, and Nat. Bank of Lebanon v. Commonwealth, 118 Ky. 51, 80 S. W. 479, 81 S. W. 686, 25 Ky. Law R. 2254. There the liabilities attempted to be compromised or released were fixed demands; that in the first mentioned case being for taxes, fixed by the regular assessment of the property, and in the hands of the collecting officer. The court held that the section of the Constitution forbade a compromise of such fixed moneyed liabilities due to a city, county, or the State. But in the first mentioned of those cases this court expressly said: "We do not mean to hold that an unlimited (unliquidated) demand, by or against the city, can not be compromised, but we think that, when the liability to the city is fixed, it can not be relinquished in whole or in part." As said by counsel in the brief, the right of the State, and of its political subdivisions, to exercise the right to contract, and to modify or change the contractual relation with the consent of the other contracting party, is an important one, and should not be limited. "That it may be abused is no argument against its existence. It was the exercise of this power which was upheld by this court in the case of Cumberland T. & T. Co. v. City of Hickman," supra. An examination of the procedings had in the constitutional convention, as shown by the published debates (volume 3, pp. 3896, 4313; volume 4, pp. 5564, 5686, 5687), resulting in the adoption of the section as it now reads, discloses that section 52,

as originally drafted and proposed, inhibited the release or extinguishment, in whole or in part, of "the contract, indebtedness, liability, or obligation, of any corporation or individual to the State, or to any county or municipality thereof." Subsequently, on revision, the words "contract" and "obligation" were stricken out, by which the restriction of the power of release or extinguishment was limited to "the indebtedness or liability of any corporation or individual" to the State, or county, or municipality. And in that form the section was adopted and is now in force.

Aside from the conviction that is impressed upon the mind by the elimination of the words "contract" and "obligation" from the section, that there was no purpose by the language left remaining to limit or restrict the right of the State, the counties, or the cities thereof in the power and right to contract is negatived by the intent declared at the time, when in the debates the reason for the change is given in this language: "We did not think it was proper to say that the Legislature should not have the power to release a person from a contract, provided both the Legislature and the other party desired to be released from it. Our intention was to provide that they should not be released from liabilities incurred, whether by contract or subsidy; but we do not believe that, if one Legislature should make an unwise contract, and the people see it was unwise, and that the next Legislature, both the people, through their representatives, and the party with whom the contract was made, desired to be released, it should not be done. In other words, we do not want to get in the fix that they are in Tennessee. They made a contract, and now both sides are willing to do away with its con-

tract, and yet they cannot.'' And with that declaration of its purpose, the section was adopted.

As.the judgment of the court below was based entirely upon its idea of the insufficiency of the petition, this court has only considered the questions arising upon the demurrer to the petition.

For the reasons stated, we are of the opinion that the court below erred in sustaining appellee's de-.murrers to the petition, and in dismissing appellants' petition. The judgment appealed from is reversed and remanded for further proceedings consistent with this opinion.

Special Judges EDELEN *and* LINDSEY sat in lieu of Chief Justice O'REAR and Judge LASSING, declining to sit. HOBSON, NUNN, and CARROLL, JJ., dissent in part.

CARROLL, J. (dissenting). I concur with a majority of the court in holding that the appellants had a right to institute and maintain this action, and in a proper case obtain the relief sought. But, being of the opinion that the ordinance in controversy is invalid, I have considered it proper, in view of the importance of the public questions involved, to put on record my reasons. An answer as well as an intervening petition was filed, but as the case went off in the court below upon a demurrer to the petition, and the majority opinion only deals with the sufficiency of the petition, I will confine what I have to say to the questions that arise upon a consideration of this pleading. One of these questions—that involving the right of the city council to enact an ordinance relieving the Home Telephone Company of the obligation it assumed, in the franchise granted to it in November, 1900, to pay the city a stipulated amount upon each

telephone in use in excess of 6,000 telephones—was considered by the court, and it was held in the majority opinion that this contract obligation upon the part of the company was not a liability within the meaning of section 52 of the Constitution. Another question presented by the petition is whether or not the ordinance afforded free and equal opportunity, within the meaning of section 164 of the Constitution, to all persons who might desire to bid for and purchase the franchise, and it was ruled that it did. And yet another, the right of the council, independent of the Constitution, to cancel a contract beneficial to the city and its inhabitants. The majority opinion does not discuss the last-mentioned feature of the ordinance, although it is material in the disposition of the case, and may with propriety be considered in determining the sufficiency of the petition, as the courts may take judicial notice of city ordinances.

Section 2775 of the Kentucky Statutes of 1903, which is a part of the charter of cities of the first class, provides in part that: "The courts of this Commonwealth shall take judicial cognizance of the ordinances of the city, and the printed copy officially published by the city may be read as evidence in any trial in which the same may be competent evidence without proof of the passage and approval of said ordinance." So that, although the ordinance of November, 1900, granting a franchise to operate a telephone system in the city of Louisville, which franchise was purchased by the Home Telephone Company, is not a part of or noticed in the petition, it may be considered in connection with it. The franchise purchased by the Home Telephone Company under the ordinance of 1900 gave it the right to maintain and operate in the city a telephone system for a period of 20 years, and

among other things, stipulated: ''That when the purchaser of said franchise or privilege, or his assigns, in the operation of said telephone plant or system, shall have in use within the city of Louisville six thousand (6,000) instruments furnishing telephone service, to six thousand (6,000) persons, firms or corporations, then the said owner or owners of said telephone plant or system shall pay to the city of Louisville, in addition to all municipal taxes, the sum of one ($1) dollar per annum for every such additional telephone service or instrument in excess of six thousand (6,000), which payments shall be made semiannually on January 1 and July 1 of each year to the city treasurer, and it shall be the duty of the purchaser or owner of said franchise or privilege, or his assigns, on the first days of January and July of each year, commencing with the first day of January after the completion of said plant and putting the same in operation, to make a report to the city comptroller, which shall be in writing and sworn to by the president of the company or the general manager or the owner of said telephone system, and shall set forth therein the number of its patrons and the number of the telephone instruments it has in use at the date of each of said reports. All rentals shall be payable quarterly in advance.'' It further fixed the maximum rates which could be charged for the use of telephones, providing in section 9 that: ''The rates to be charged by the person, firm or corporation owning or exercising the franchise or privilege aforesaid for the use of their telephones shall not exceed the following schedule, to wit: Forty-eight ($48) dollars per year for each business telephone on an individual wire with metallic circuit wherever located within the city limits; for each residence telephone on an indi-

vidual wire with metallic circuit within a radius of one mile from the courthouse in said city, twenty-four ($24) dollars per year; for each residence telephone on an individual wire with metallic circuit within a radius of two miles of the courthouse and exceeding one mile therefrom, within the city of Louisville, thirty ($30) dollars per annum; for each residence telephone on an individual wire with metallic circuit within the limits of the city of Louisville and outside of said radius of two miles from the courthouse, thirty-six ($36) dollars per year. On extension desk telephones the rate shall not exceed twelve ($12) dollars per annum, and for installing extension bells five ($5) dollars each." The ordinance in controversy provides in section 6 that: "Should the franchise herein ordered to be sold be at any time acquired by any person who at the time of such acquisition already owns a telephone franchise previously granted by the city of Louisville, such previously granted franchise shall immediately upon the acquisition of the franchise herein ordered to be sold become null and void, and be forfeited and surrendered to the city of Louisville; and all obligations created by the ordinance granting the same or acceptance thereof shall immediately·cease and determine." It is also provided in section 10 that: "The rates to be charged by the owner or operator of such system shall be for a business telephone not more than seven dollars; for a two party line business telephone not more than four dollars; for a single residence telephone not more than three dollars and a half; for a two-party line residence telephone not more than two dollars and a half."

It will be thus observed that if the Home Telephone Company should become the purchaser of the fran-

chise under the new ordinance, thereupon, and by reason of its purchase, its obligation and liability, under the franchise that it owns and is now operating, to pay to the city $1 per annum for every telephone in use in the city in excess of 6,000 would be at once extinguished, and it would be relieved of this burden, and the city deprived of the revenue, whatever it may be, derived from this source. In addition thereto it will be noticed that the old franchise bound it for the term of 20 years to furnish telephones at a price not eceeding $4 per month to business houses, and at a price not exceeding $2 per month to residences, while the new ordinance permits the purchaser of it to charge $7 per month for a business telephone, and $4 for a residence telephone. So that, if the franchise under the new ordinance is purchased by the Home Telephone Company, the city of Louisville will lose the revenue it may reasonably expect to derive from the use of telephones in excess of 6,000, and the citizens and taxpayers of Louisville will be required to pay almost twice as much for telephone service furnished by the Home Telephone Company as they do under the existing ordinance. It is therefore manifest that the ordinance offering this new franchise for sale was not enacted for the benefit of the city of Louisville or the citizens and taxpayers thereof, but on the contrary, its adoption was detrimental to the city and the citizens. It is further apparent that the only person benefited, or intended to be benefited, by the new ordinance is the Home Telephone Company.

Setting aside for the present the question whether or not the obligation of the Home Telephone Company under the old franchise is a liability within the meaning of section 52 of the Constitution, and the

Louisville Home Telephone Co. v. City of Louisville.

further question whether or not the ordinance is a fair and equal one within the meaning of section 164 of the Constitution, I will take up the proposition whether the municipal boards of a city that have entered into a valid contract, admitted to be beneficial to the city and its inhabitants, can subsequently, by the consent of the other contracting party, cancel the contract and exonerate the other party from all obligations assumed under it to the city and its people. In support of the proposition that municipal authorities, in the exercise of the power vested in them by the statute to contract and be contracted with, may modify or annul any contract they have made, by the consent of the other contracting party, the argument is made, first, that if it is competent for the municipal authorities to enter into a contract, it is also within their power to annul or modify the contract, with the consent of the other contracting party; and, second, that if this power was denied, a city would be disabled from annulling or modifying, by consent of the parties, a contract that experience or time had proven to be disadvantageous or undesirable to both; that this condition of affairs might impose upon the people of a city onerous burdens, from which they could not be relieved until the expiration of the contract period, although both the contracting parties were willing to make a change. I do not, of course, deny that municipal authorities, within the scope of the power granted to them by the statute, may enter into contracts, nor do I maintain that municipal authorities may not, by the consent of the other contracting parties, modify or cancel a contract that time or experience or other reason has shown to be disadvantageous to the people of the city, or that was entered into under a mutual mistake. And I agree that the pre-

sumption must be indulged that the boards will act within their powers for the best interests of the city, and discharge with sound judgment and fidelity the duties of their office, and, further, that the courts ought not to undertake to control their discretion, in municipal affairs, unless it is made clearly to appear that they have exceeded their authority or have acted fraudulently or corruptly. My position is that municipal boards occupy a position of trust; that they are agents and servants of the people of the city, and must perform their duties with fidelity to the welfare and interest of the people they represent for the time being; that their powers are delegated and limited; that although they may enter into contracts and, in certain states of case, cancel or modify them for a valuable and sufficient consideration, or in cases where a mutual mistake was made, or when it is for the best interest of the city, yet they can not modify or cancel to the detriment of the people, whose agents they are, a beneficial or advantageous contract, made with an individual or corporation, solely for the advantage of such person or corporation. To sanction a power like this would be giving to municipal boards authority not granted to any other agent or trustee; and when it is attempted, the courts have the same power to interfere and control as they do in any case where the principal or agent is exceeding his powers. And I rest my argument on the right of the court to interpose upon the ground that the council, in the enactment of so much of the ordinance as exonerated the Home Telephone Company from its liability and obligation, exceeded its power as much, although in a somewhat different way, as was attempted by the council that undertook to relieve the city railway company from the payment of taxes, but was pre-

vented by this court, in the case of City of Louisville v. Louisville Railway Company, 111 Ky. 1, 63 S. W. 14, 23 Ky. Law Rep. 390, 98 Am. St. Rep. 387.

When the bid for the franchise offered for sale under the ordinance of 1900 was accepted by the council, a valid and binding contract was entered into between the city and the Home Telephone Company for a term of 20 years. This contract neither party, under the facts presented, could modify or cancel without the consent of the other. Page on Contracts, section 1756. While admitting the correctness of this proposition, it is nevertheless confidently asserted that, as any kind of a contract may be altered or annulled by the consent of the contracting parties, so may a contract entered into by and with a municipality. Therefore the argument is made that, as the council and the other contracting party have consented to a cancellation of the contract, the courts have no authority to interfere; that the matter is entirely within the power and discretion of the council and the council is to judge unrestrained of the necessity or reason for its cancellation and its acts are final and conclusive. In support of this contention counsel cite Bean v. Jay, 23 Me. 117, Nelson v. Milford, 7 Pick. (Mass.) 18, Meech v. Buffalo, 29 N. Y. 198, and section 477 of Dillon on Municipal Corporations, where the author supporting his views by the cases supra, states that: "Growing out of its authority to create debts and to incur liabilities, a municipal corporation has power to settle disputed claims against the city, and an agreement to pay these is not void for want of consideration. If it has obtained a contract, which by mistake or a change of circumstances it deems to operate oppressively upon the other party, an agree-

ment to make an additional compensation or to modify or annul it.is not invalid for want of consideration.'' The case of Meech v. Buffalo is the only one of the three that is at all in point, and it does not decide the question presented in this case. There it appeared that the city ordered the construction of a sewer, and simultaneously determined that the amount to be assessed for the expense of the same be the sum of $1,058, and directed the city assessor to assess the same upon the real estate benefited by such improvement, and the amount was so assessed. Afterwards the corporation contracted with one Randolph to construct the sewer for $1,058, and Randolph gave security for the performance of the contract on his part. ''While prosecuting the work, but before its completion, he struck and touched a bed of quicksand below the surface of the earth, of great extent, and directly in the line of the sewer, the existence of which was theretofore unknown to both the contracting parties, and could not have been anticipated by either of them. The existence of the quicksand increased the expense of the construction of the sewer to such an extent that it was impossible for Randolph to construct the same for twice the amount of the contract price. Whereupon he stopped working upon it, and petitioned the common council to increase the contract price for building the sewer, to indemnify him for the loss which he would sustain by reason of such quicksand if he should go on and complete the sewer for the contract price. Upon such petition the common council determined to pay and allow to Randolph an additional sum on his contract. Randolph would have abandoned the work in its incompleted and unfinished state unless the additional allowance had been made to him as an indemnity for the loss which he

would have sustained by reason of the quicksand, and this intention was known to the common council. Taxpayers of the town resisted the imposition and collection of this $588, upon the ground that the council had no power to add to the amount for which Randolph had agreed to construct the sewer," but, under the facts, the court held that it was within the power of the council to make the additional compensation. It is evident that the last sentence in the quotation from Dillon was rested upon this case, as no other authority is cited in support of it.

I have made diligent search, but without success, to find any authority supporting the view that a city council without any consideration may surrender or give away valuable property rights secured to the city under a fair contract, entered into by the contracting parties with full knowledge of existing circumstances, and the reciprocal rights and duties assumed. City councils are not invested with supreme power. They are not altogether above judicial control. They have large powers and extensive discretion, but these powers, and the discretion incident thereto, are delegated. They must be exercised within statutory limits, and when these limits are exceeded, their action may be reviewed by the courts. That they did exceed them in this case I have no doubt. The inhabitants of a city, although the principals, and indeed the corporation itself, are necessarily obliged to transact their business through agents appointed or selected for that purpose. And to say that these agents may cancel a contract made between the city and an individual, to the end that the individual may be benefited by the cancellation, and the people of the city damaged by it, seems to me to be unsound in principle, and entirely beyond the scope of the author-

ity of these municipal agents. In this case the city
will secure no consideration for its agreement to
relieve the Home Telephone Company from its con-
tract. True the ordinance provides for an upset
price of $5,000 and the free use by the city for a few
telephones, but these considerations are a part of the
purchase price of the new franchise that any bidder
would be obliged to pay and perform, and are not a
reward paid to be released from an existing contract.
The case before us furnishes a striking example of
the necessity for judicial interposition, and illustrates
well the evil consequences that would follow from a
doctrine declaring that municipal boards had unlim-
ited authority to cancel without consideration any and
all contracts entered into between the city and per-
sons or corporations. The telephone is one of the
most useful of modern improvements. It has already
become almost as essential to the convenience of the
people as the common carriers. It is found in every
well-appointed home, and it is rarely absent from a
place of business. People use it one way or another
in all the affairs of life. It is therefore highly im-
portant to the people of a city that telephone rates
should be fixed at a reasonable price, in order that
poor persons and those of moderate means may be
able to have it in their homes and places of business.
Under the contract made with the Home Telephone
Company in 1900 the people of the city of Louisville
were assured that for the term of 20 years from that
date they would have furnished to them telephone
service at reasonable rates. The ordinance provides
in section 10: ''That the apparatus, instruments,
switch boards, appliances and equipment of said tele-
phone system shall be of the best, most modern and
approved central energy type, and all switch boards

shall be of the multiple form except in subexchanges and shall be maintained during the period and existence of the said franchise or privilege with the best equipment possible, and the telephone service thereby shall be first-class in all respects and continuous and unlimited for twenty-four (24) hours in every day during the entire period for which said franchise or privilege shall be granted, except interruptions from unavoidable causes." But the enjoyment of this reasonable privilege will be taken away without consideration if this ordinance is valid.

It does not appear that any citizen of Louisville is objecting to the rates now charged, or complaining of the services rendered by the Home Telephone Company. But the company, after having operated its plant for several years, concluded that the rates fixed by the ordinance were too low; that the service it rendered to the city and the people were being furnished too cheaply; that the contract by which it assumed to pay a stipulated sum for each telephone in excess of 6,000 was an onerous burden upon it, and therefore it applied to the council to offer for sale another franchise. I use the expression "it applied to the council" because the ordinance upon its face shows, as I will presently point out, that it was really enacted for the benefit of the Home Telephone Company, and the petition avers that: "The Louisville Home Telephone Company has a special interest in the sale of said franchise, because it expects and intends to become a bidder for said franchise when sold by the board of public works, and hopes to become, and believes it will become, the purchaser thereof; and it desires to have opportunity, and has the right to have the opportunity, of thus acquiring the franchise for the operation of a telephone plant in the city

of Louisville in accordance with the terms set forth in said ordinance.''

I have heretofore pointed out the material disadvantages that the city and its people will suffer if the Home Telephone Company is permitted by the purchase of the new franchise to relieve itself of the obligations it assumed under the old one.   And it is freely admitted by counsel for the company that, if it becomes the purchaser of the new franchise, the contract to pay the city for telephones in excess of 6,000, and to furnish telephones at the rates specified in the old ordinance, will be at once extinguished, except as to such individuals as have contracts, and as to them will terminate when the contracts expire. It therefore seems plain that, if the council can cancel this contract, it has the power to cancel any contract that might be made, by a person or corporation, with the city upon any subject, however injurious to the city and the people the annulment might be.   This would result, if allowable, in permitting municipal boards to destroy any advantageous contract the city might make upon the request of the other contracting party who desired to free himself from the burdens or liability assumed when the contract was entered into.   It would further result in permitting these boards to grant a gratuity, in the form of exonerations from assumed liabilities, to persons who had contracts with the city.   If in and as part of the ordinance offering for sale a new franchise, the city council has the authority to provide that the obligations assumed under the old ordinance shall be extinguished, it would seem to follow that this result could, with as much force of reason and propriety, be arrived at, by simply adopting an ordinance striking from the old ordinance the features thereof objection-

able to the Home Telephone Company, or, to put it in another way, if the provision in the ordinance in controversy that, "should the franchise herein ordered to be sold be at any time acquired by any person who at the time of such acquisition already owned a telephone franchise previously granted by the city of Louisville, such previously granted franchise shall immediately upon the acquisition of the franchise herein ordered to be sold become null and void, and be forfeited and surrendered to the city of Louisville; and all obligations created by the ordinance granting the same or acceptance thereof shall immediately cease and determine"—is valid, then why should not the council repeal by ordinance the features of the old ordinance that imposed upon the Home Telephone Company the obligations that are to be annulled if it purchased the franchise offered for sale under this new ordinance? The effect would be precisely the same. If one can be done, I see no reason why the other may not. But I doubt if the question was presented in this form if the majority of the court would have reached the conclusion that it was competent for the council to thus take away from the city, and the people of the city, valuable rights secured to them under a valid and enforceable contract, or be willing to lay down a rule that would encourage persons to enter into a contract with a city to perform for a consideration some beneficial public service, with the hope and expectation that a more accommodating council would relieve them from the onerous features of a contract that a less agreeable body had exacted. And in the views expressed upon this aspect of the case I find support in the opinion of this court in Cumberland Telephone & Telegraph Company v. City of Hickman, 129 Ky. —, 111 S. W. 311, 33 Ky. L.

R. 730, where it is said: "The grantee had agreed to certain conditions as part consideration for this grant. One of them, the rate of tolls, was of particular interest to the public, in other words, the city. The other condition was as to the time within which work on the plant was to be begun. The latter was not of so much importance to the city, except as a kind of security that the bid was in good faith. It was a condition which the city might have been justified in not exacting the penalty for its breach, if the delay had not been material. Still it was a matter of importance to the grantee, as it weakened his hold upon its franchise. We think it was competent for the city to waive the forfeiture of the franchise because the work had not been begun within six months, in consideration of a reduction of the rates by the owner of the franchise. There was a sufficient consideration moving to the city to support its waiver of the forfeiture; likewise a sufficient consideration moving to the grantee of the franchise to support his agreement to charge patrons within the city, and for whose benefit and welfare the contract had been entered into, a less rate than was originally agreed upon. In doing this the city granted no new or different right in the use of its streets, nor did it abate any of the original consideration. On the contrary, it gave only what it had originally agreed to grant, and got in exchange a better consideration."

The next question is: Is this ordinance a free and equal one and does it afford a fair opportunity to any bidder to purchase the franchise offered for sale? Section 164 of the Constitution provides that: "No county, city, town, taxing district or other municipality shall be authorized or permitted to grant any franchise or privilege or make any contract in refer-

ence thereto for a term exceeding twenty years. Before granting such franchise or privilege for a term of years, such municipality shall first after due advertisement receive bids therefor publicly, and award the same to the highest and best bidder, but it shall have the right to reject any and all bids. This section shall not apply to a trunk line railway.'' This section was incorporated in the new Constitution for the benefit of the citizens of municipalities, and not of persons or corporations who desired to purchase the right to operate public utilities. Its adoption, as said in Hilliard v. Fetter Lighting & Heating Co., 127 Ky. 95, 105 S. W. 115, 31 Ky. L. R. 1330, ''was largely due to the fact that prior to the present Constitution the municipal authorities of cities might, and did, grant valuable rights in the streets and public places to individuals and corporations desiring to use them for private gain. No restrictions were thrown around the granting of these privileges to protect the citizens from the cupidity of the council or the greed of a purchaser of a franchise. As a result, the residents and tax-payers of the city found their most valuable streets occupied by corporations, who obtained them as a result of personal favor or private traffic without just or often any compensation to the people who owned them.'' That it was further intended by this section that no advantage or preference should be shown to any person in the sale of a franchise is illustrated by the care used in providing that: ''Before granting said franchise or privilege for a term of years, such municipality shall first after due advertisement receive bids therefor publicly and award the same to the highest and best bidder''—thus throwing around the sale every possible efficient safeguard that might prevent such discrimination or favoritism as would deprive

the people of the profit or advantage they might ex·
pect to gain from the sale of the franchise. If any
preference was allowed or any favoritism permitted,
either in the ordinance authorizing the sale, or in the
conduct of the sale, or in any manner, by the munici-
pal authorities, it is clear the object of this section
would be defeated, and its useful purpose impaired,
if not destroyed. As a consequence unscrupulous or
favored persons or corporations would be enabled to
secure for a trifle, privileges that might be worth, and
that in the open market would bring thousands.

The question then arises: In what particular does
this ordinance violate the principle of fair, equal and
free opportunity to bid and buy the franchise pro-
posed to be offered? In considering this question it
is well to keep in mind the fact that the Home Tele-
phone Company at the time this ordinance was en-
acted was, and had been since 1900, operating a tele-
phone system in Louisville, and that its only compet-
itor in the business was the Cumberland Telephone
Company. Both of these corporations were engaged
in exactly the same kind of business. Each of them
was operating under a franchise granted by the city,
and there was genuine and active competition be-
tween them. This being true, it strikes one at first
blush as being singular that one of these companies
should be excluded from bidding or becoming a pur-
chaser of the franchise. No good reason, nor indeed
any reason, in my opinion, is offered to explain why
the Cumberland Telephone Company was discrimi-
nated against, and the Home Telephone Company
favored, in this respect. I am unable to perceive how
the purchase of this franchise by the Cumberland
Telephone Company would give it any greater monop·
oly than would its purchase by the Home Telephone

Company. If the Cumberland Telephone Company became the purchaser, its purchase would not in any manner interfere with the rights and privileges of the Home Telephone Company under its existing franchise. And so, if the Home Telephone Company should become the purchaser, its franchise would not prevent the Cumberland Telephone Company from competing with it for business under the franchise giving it the right to operate a telephone system. It is, however, said that the premable to the ordinance sets out the reasons why the Cumberland Telephone Company was excluded. This preamble declares: "Where as, it is desired to secure for the public more efficient competition with the Cumberland Telephone & Telegraph Company, and whereas, requirements of the telephone franchise heretofore sold for that purpose embraced certain restrictions that make such competition impossible; therefore, be it ordained by the general council of the city of Louisville."

I confess my inability to understand how the restrictions as to rates, imposed upon the Home Telephone Company by the ordinance of 1900, and heretofore pointed out, prevented it from being an efficient competitor of the Cumberland Telephone Company, or how the purchase by it of the franchise offered under the new ordinance would make it a helpful competitor in the interest of the public. The theory of the Home Telephone Company is that, if it is allowed to charge higher rates than its existing franchise permits, it may be a more efficient competitor than it could under the law rates; but, it seems to me that this reasoning is fallacious. The competition favored by the Constitution is a competition that benefits the public, a competition that reduces rates, and not a competition that enriches the competitors at the expense of the public,

or that enables them to charge rates that, compared with existing rates, appear unreasonable. This kind of competition may be desirable looking at the matter from the standpoint of the corporation, but it is clear that it is not the kind of competition that the law regards with favor. But, as authorizing the exclusion of the Cumberland Telephone Company, its counsel relies with great confidence upon the opinion of this court in Stites v. Norton, 125 Ky. 672, 101 S. W. 1189, 31 Ky. L. R. 263, 13 L. R. A. (N. S.) 474. I think the ruling of the court in that case was sound in principle when applied to the facts stated in the opinion, but I am also confident that it should not be extended to embrace the state of case presented by this record. The purpose of that opinion was to encourage real competition, to the end that the people using public utilities might be benefited, and to prevent the creation of a monopoly. It was not the purpose of the court, in excluding the Louisville Lighting Company as a bidder, to encourage favoritism or discrimination without a corresponding benefit to the public. That this is a proper construction of the opinion may be readily understood by carefully considering what was decided. In that case the city offered for sale a franchise to string and maintain wires along the streets of the city for distributing and selling electricity. The ordinance creating the franchise excluded the Louisville Lighting Company, upon the ground that it already had all the privileges conferred by the ordinance; it being admitted that the Louisville Lighting Company and its associated corporations owned and operated, at the time the ordinance was adopted, the only franchise for lighting the city with electricity, and further admitted that, if it or those acting in its interests were permitted to bid at

the sale of the new franchise, the purchase would be for the purpose of suppressing and preventing operation under it. Under these facts the court, in sustaining the right of the city to exclude the Louisville Lighting Company as a bidder, said: "The receiving of such a bid would have had the effect to delay, hinder, and possibly prevent the lawful purpose of the council in attempting to relieve the city from extortion. A bid made for such a purpose and with such an intent, is not a bid in the sense and meaning of section 164 of the Constitution. Legislative bodies should be very careful in prohibiting persons or corporations from bidding at such sales; and, if it should be made to appear that bids were rejected by reason of any ulterior, sinister, fraudulent, or unlawful purpose or reason, the court should grant relief, but when made to appear, as in this case, that the prohibition of a bid was made for the just and lawful purpose of enabling the council to secure to the citizens their rights under the Constitution, the court should uphold rather than condemn its action."

That there is a radical distinction between the facts before the court in the Stites Case and the facts exhibited by this record is made manifest by what has been heretofore said. The Stites Case presented exceptionally good and strong reasons for the application of the rule announced, none of which exist in this case. That the purpose in excluding the Cumberland Telephone Company was not to benefit the public or give fair competition, but to benefit the Home Telephone Company alone, is manifest. So that the question comes up: Is an ordinance that excludes a bidder, for no other reason than that he is already in competition with the bidder who desires to purchase the franchise, authorized by the Consti-

tution? I think not. If the Stites Case should be extended along logical lines, both of these telephone companies should be excluded from purchasing the privilege of establishing a new telephone system; but, clearly one of them should not be. If municipal bodies could thus discriminate between competitors, without any reason except the desire to favor one above the other, the result would be that bribery, corruption, and improper influences would be resorted to by the owners of the competing plants whenever an ordinance for a new franchise was pending, the purpose of each being to exclude the other as a competitor. As a necessary consequence of this, the citizens of the municipality would be denied the right guaranteed to them by the Constitution to have these privileges sold at public outcry, after due advertisement, to the highest and best bidder. If, under circumstances like these, a city council can exclude one competitor from bidding for a franchise granting a privilege in which only two are engaged in the business of conducting, I see no reason why they might not say that only one of four or more persons or corporations, engaged in identically the same business, should be permitted to bid for or purchase a new franchise to conduct a similar business. And so, if this theory of exclusion and discrimination was authorized, a council could virtually award a franchise to its favorite corporation without any excuse or reason except that found in the influence of this councilmanic favorite. It needs no argument or elaboration to show what unfortunate results would follow from such a practice, if legalized. It was surely not contemplated by the Constitution makers that this valuable section, intended to secure competition, prevent discrimination, and deny favoritism, might be made the efficient instrument in the

Louisville Home Telephone Co. v. City of Louisville.

accomplishment of the very ends intended to be prevented. It would be a most remarkable condition of affairs if A, B, and C, who were engaged in the same identical business, in real competition with each other, and with D, should be denied the right to bid for a franchise permitting the purchaser to conduct the same business they were carrying on, and yet allow D to bid for and buy the franchise. This rule would prevent competition, deny equality, encourage discrimination, and foster favoritism. In short, it would be an active aid in everything that the Constitution was designed to prevent.

The ordinance in question not only excludes the Cumberland Telephone Company, but it also provides that, if the Home Telephone Company is the purchaser, its former franchise shall be at an end. In other words, if the Home Telephone Company purchases the franchise, it will be released from its obligation to furnish telephone service at the present rates, and will be allowed to charge almost double as much for the same service. It will also be released from its obligation to pay the $1 each on all telephones over 6,000. If any one else buys the franchise, he will get no more than the privileges granted; but if the Home Telephone Company buys the franchise it will get in addition a release from its present obligations to the city. The bidders, therefore, will not stand upon an equal footing. The provision of the Constitution that the franchise shall be sold to the highest and best bidder after due advertisement is meaningless if such an ordinance as this can be sustained. The purpose of the Constitution is that the franchise shall be sold to the highest and best bidder after due advertisement, so that the city shall derive as much from the sale as can be gotten. The purpose

of the ordinance is not to make anything for the city, but to relieve the Home Telephone Company from its present obligations under the form of a sale of a new ordinance. When the ordinance is read in the light of the allegations of the petition that the Home Telephone Company expects to be a bidder at the sale, it is manifest that the ordinance was designed to sell a franchise which only the Home Telephone Company could buy, and that it should be the only bidder at the sale, for no one can compete with it in bidding for this franchise, as no one can get, if he purchases, the same advantages as it will get. Free and equal competition is the fundamental aim of the constitutional provision, and when there is no free and equal competition, the constitutional provision is violated. Here the ordinance excludes from the bidding appellant's only competitor; and then gives it, if it purchases, privileges that no one else gets if he should purchase it. It is uniformly held, under statutes providing for sales to the highest and best bidder, that unless there can be real competition, the statute is violated. Fairfax v. Hopkins, 8 Fed. Cas. 955, No. 4,614; Hart v. Buckner, 54 Fed. 925, 5 C. C. A. 1. And where the statute provides for the letting of public improvements to the lowest and best bidder, it is in like manner also held that the proceeding is void where the ordinance prescribes conditions preventing fair and free competition. Fineran v. Central Bitulithic Co., 116 Ky. 495, 76 S. W. 415, 125 Ky. Law Rep. 876; Fishburn v. Chicago, 171 Ill. 338, 49 N. E. 532, 39 L. R. A. 482, 63 Am. St. Rep. 236; Diamond v. Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448. Here we have not a statutory provision, but a mandatory provision, of the Constitution. While the city council has legis-

lative authority, it has this authority subject to the Constitution. Any legislation it makes in conflict with the Constitution is void. The public sale of the franchise in question is but a form of granting a special privilege to the Home Telephone Company, and when such proceedings are sustained, the door is open for all the abuses which the constitutional provision was intended to prevent. The exclusion of the Cumberland Telephone Company from bidding and the favoritism shown the Home Telephone Company were both in violation of section 164 of the Constitution, and for these reasons the ordinance should be declared invalid.

I am further of the opinion that the obligation upon the part of the company, under its contract of 1900, to pay to the city $1 per annum for each telephone in use in the city, in excess of 6,000, during the life of the contract, which was for a term of 20 years, was a liability within the meaning of section 52 of the Constitution, and the attempt to release the company a violation of the section which provides that: "The General Assembly shall have no power to release, extinguish, or authorize the releasing or extinguishing in whole or in part, the indebtedness or liability of any corporation or individual to this Commonwealth, or to any county or municipality thereof"—and should be given a liberal and not a strained construction. In other words, it should be so interpreted as to give to the city the full measure of protection intended to be conferred by the section. The words "liability" and "indebtedness" used in the section are the leading features of it. The other words merely describe the bodies that may not release or extinguish an "indebtedness" or "liability." It is to be presumed that they were used in the ordinary and usual acceptation

of these words. They are not technical, but are commonly employed in the everyday affairs of life. If we say that a person is indebted, or that he has assumed a liability, it will be understood that there is some contract obligation existing under and by virtue of which the liability or indebtedness was created or incurred. The amount of the liability or the extent of the indebtedness is not material. It may be $1 or $1,000 or the rendering of service. Nor is it important when the contract was created, if it be valid, or when the indebtedness or liability is to be liquidated, or whether it may be paid in installments or as a whole. Webster defines "liability" as the "state of being liable, that which one is under obligation to pay, or for which one is liable." The word "liable" is defined as being "bound or obligated in law or equity, exposed to a certain contingency or casualty, more or less probable." And defines "indebtedness" as the "state of being indebted; that is, brought into debt, being under obligations, held to payment of requital, beholden, placed under obligation for something received, for which restitution or gratitude is due." It will be seen from these definitions that the word "liability" is sufficiently comprehensive to include any kind of legal or equitable obligation to do or perform a certain thing. If it was only intended that the section should be applied to contract obligations to pay a fixed sum of money, there would have been no reason for using the word "liability," as the word "indebtedness" covers and embraces all ordinary debts. It is therefore fair to assume that the word "liability" was added to remove any doubt that might exist as to the intent of the section. It is a word of broader meaning than "indebtedness" and

includes matters that the word ''indebtedness.'' might not reach.

There is no dispute about the terms of the contract between the city and the telephone company; nor is there any denial of its validity, so that, the only question to be considered is whether or not it created a liability to the city upon the part of the Home Telephone Company. It was agreed, as a part of the contract, that if the Home Telephone Company put in operation any telephones in excess of 6,000, that it would pay to the city $1 for each telephone over that number. It is therefore plain that, if the company installed, during the existence of the franchise, over 6,000 telephones, there would not only be a liability to pay the stipulated fee for the excess, but the creation of an indebtedness, upon which the city might maintain an action. But the argument is made that this liability is too contingent to come within the meaning of section 52. That there may or may not be any telephones over 6,000 in use, and hence there may or may not be any indebtedness or liability on the part of the company under its contract. Granting, for the sake of argument, that the company might not have over 6,000 telephones in use, and consequently not become liable or indebted to the city in any amount, this does not prove that no liability was created. The mere fact that it is contingent in this particular does not take it out of the reach of the constitutional provision. It is not necessary that the extent or exact or approximate amount of the liability be specified, or that it shall be definitely fixed. It was clearly contemplated by the parties to the contract that at some time during its existence the number of telephones would exceed 6,000, and it was further contemplated that the contract would run for the full term of 20

years. Therefore the city has the right to exact from the company any amount that may become due at any time within 20 years. That this condition was incorported in the ordinance is some evidence of the fact that the city expected to derive benefit from it. I might add that it is stated in the opinion that there is now in service 8,000 telephones, and that the city is deriving an annual income therefrom of $2,000, thus making it plain that the contract in this particular is valuable to the city, and creates a liability, as well as an indebtedness, upon the part of the Home Telephone Company that it wishes to be relieved of.

For the reasons stated, the general demurrer to the petition was properly sustained.

I am authorized to say that JUDGES HOBSON and NUNN *concur* in this dissenting opinion.