## Gathright, et al. v. H. M. Byllesby & Company, et al.

(Decided May 28, 1913.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Municipal Corporations—Ordinance—When Void.—An ordinance passed by a municipality cannot be invalid upon any other ground than its illegality. It is not within the province of the court to say that a valid ordinance is unwise or impolitic; those questons must be addressed solely to the General Council.

2. Municipal Corporations—Ordinance—Discussion of.—It is not for the courts to say how much discussion the General Council should allow before adopting an ordinance, or that parliamentary rules of procedure should be applied otherwise than under the ordinary rules of such procedure.

3. Municipal Corporations—Amendment of Ordinances.—Section 2777 of the Kentucky Statutes, whch provides that no ordinance shall be altered or amended in any way except by repealing it, was intended to prevent loose legislation of doubtful meaning rather than to control parties in the exercise of their rights under existing ordinances.

4. Municipal Corporations—Granting of New Franchise Upon Expiration of Original Franchise.—Where a gas franchise expires, and the city is required under section 3037d of the Kentucky Statutes to sell a similar franchise, the owner of the expiring franchise is the only one that can complain if the city offers to sell a new franchise different from the one that has expired.

5. Municipal Corporations—Power to Contract as to Existing Franchise.—A municipality cannot, in the absence of express legislative authority, make contracts or pass by-laws which would cede away, control or embarrass its legislative or governmental powers, or which would disable it from performing its public duties; but this rule does not prevent the municipality from contracting with the owner of the franchise to waive a contract right.

6. Municipal Corporations—Power to Contract.—Where, under the charter of a gas company, the city had the right to purchase the plant at the expiration of the charter, the city has the power to grant a new franchise and to postpone the purchase of the plant until the expiration of the new franchise.

7. Municipal Corporations—Power to Contract for Future Maximum Rates for Electricity.—Where a municipality expressly reserves the right to make reasonable regulations of rates for electricity, an ordinance which provides that the city will, in the future, pass an ordinance fixing maximum rates for electricity to which the owner of the franchise to furnish electricity agrees, the ordinance is not illegal upon the ground that it undertakes to commit the General Council, in advance, to certain maximum rates, since the General Council may, at any time, fix other rates provided they be reasonable.

8. Public Policy—How Expressed.—The public policy of a State is expressed in its Constitution and Statutes, and in its common law as found in the opinions of its court of last resort; and if the Constitution or Statutes speak upon a subject, the public policy of the State is fixed to that extent.

9. Municipal Corporations—Contract—Public Policy.—The act of a municipality which has the sanction of law, cannot be against public policy.

10. Trusts—Pools—Subject to Fine Only.—Under the Act of 1906 (Kentucky Statutes section 3941a), known as the "Pooling Statute," and which amended the Act of 1890 (Kentucky Statutes, 3915 to 3941 inclusive) against "Pools, Trusts and Conspiracies," there is no prohibition against the formation of trusts or pools in Kentucky, since the Act of 1906 merely provides a fine against trusts and pools in case they sell their products above or below their real value.

11. Municipal Corporations—Franchise to be Sold After "Due Advertisement."—Under section 164 of the Constitution, which provides that a municipality can only sell a franchise "after due advertisement," the court cannot question the good faith of the council in fixing the length of the advertisement at not less than two weeks, and in two different newspapers.

12. Municipal Corporations—Sale of Franchise—Highest and Best Bidder.—Under section 164 of the Constitution, which requires all franchises granted by a municipality to be sold publicly to the highest and best bidder, an ordinance which is so drawn as to confine the bidding to one person is invalid.

13. Municipal Corporations—Sale of Franchise—Exclusive Bidder.— The mere fact, however, that one bidder has, by reason of his ownership of an existing franchise, or his capital, an advantage over other bidders, does not make him an exclusive bidder within the rule above laid down.

14. Municipal Corporations—Franchise May be Confined to Territory Already Occupied.—The fact that an ordinance for the sale of a gas or electric franchise is drawn so as to cover only territory already occupied by the pipes or wires of an existing company, will not invalidate the ordinance.

15. Municipal Corporations—May Waive Franchise Provision.—A provision in the franchise of an electric company prohibiting it from selling out to a competitor may be waived by an agreement be-

tween the owner of the franchise and the municipality that granted it.

16. Municipal Corporations—Waiver of Franchise—Exclusive Bidder. —Where the franchise of an electric company prohibited it from selling out to a competitor, and the municipality offered to sell a natural gas franchise, and agreed to waive the prohibition in favor of the competitor of the electric company in case it should buy the natural gas franchise, the ordinance offering the natural gas franchise for sale did not violate the rule against exclusiveness in public bidding, since the waiver merely put the competitor upon an equal footing with other bidders.

WEHLE & WEHLE, W. W. THUM, C. C. HIEATT, JOHN H. CHANDLER and HENRY M. JOHNSON for plaintiffs.

PENDLETON C. BECKLEY, J. W. S. CLEMENTS and STUART CHEVALIER for City of Louisville, et al.

O'DOHERTY & YONTS for Kentucky Heating Company.

A. J. CARROLL for Kentucky Electric Company.

HUMPHREY, MIDDLETON & HUMPHREY for H. M. Byllesby & Company, et al.

OPINION BY JUDGE MILLER—Dissolving Injunction.

This injunction suit was brought by J. B. Gathright and fourteen other citizens and taxpayers of the city of Louisville, against "H. M. Byllesby & Company," incorporated, the Louisville Gas Company, the Kentucky Heating Company, the Kentucky Fuel Gas Company, the Louisville Lighting Company, the Kentucky Electric Company, the city of Louisville, W. O. Head, Mayor of the city of Louisville, Pendleton Beckley, attorney for said city, and John D. Wakefield, M. W. Neal, and James G. Caldwell, constituting the Board of Public Works of the city of Louisville, to enjoin the sale of a franchise for furnishing natural gas, manufactured gas and mixed gas to the city of Louisville and its citizens as provided by an ordinance of the city of Louisville approved March 29, 1913, and for other ancillary relief.

An understanding of the case requires a somewhat extended statement of the facts upon which the action is based.

Two ordinances were passed by the General Council of the city of Louisville, the first on March 27, 1913, and the other on March 28, 1913. Both were approved by the Mayor on March 29th. One ordinance provides

for the sale of a franchise for furnishing natural gas, manufactured gas and mixed gas to the people of Louisville, while the other ordinance provides for the execution of a contract between the city of Louisville and "H. M. Byllesby & Company," which controls and operates certain companies engaged in the furnishing of gas and electricity in said city. The proposed contract, among other things, requires H. M. Byllesby & Company to bring natural gas into the city of Louisville; fixes maximum rates to be charged therefor, and defines certain rights of the city with reference to said companies. As above stated, this action seeks to prevent, by injunctive process, the carrying out of the plan contemplated by said ordinances.

Pendleton Beckley, attorney for the city of Louisville, is also made a defendant, and an injunction is sought against him to prevent a dismissal of the case of the city of Louisville against the Kentucky Electric Company now pending in the Jefferson Circuit Court and which will hereinafter be noticed.

The chancellor granted the relief asked, and enjoined further action under said ordinances; whereupon the defendant entered a motion before me, one of the judges of the Court of Appeals, to dissolve that injunction, as is provided by the Civil Code of Practice. On account of the importance of the questions involved, the case was heard by five of the judges of the court, in order that the decision might be the decision of the court rather than the opinion of a single judge thereof.

The injunction is asked upon the ground that the General Council of the city of Louisville was without authority to pass said two ordinances, or at least one of them.

Preliminary, however, to a discussion of the law of the case, it may be profitable, if not necessary, to consider the gas and electric light situation in Louisville. At present there are two gas companies and two electric light companies operating in Louisville. The Louisville Gas Company was chartered in 1838, for a period of thirty years. A new charter was granted it in 1868, for a period of twenty years; and in 1888 it obtained a third charter extending its existence for a term of thirty years. Its present charter will, therefore, expire on January 1st, 1919, and the city will then have the right to buy the gas plant if it should then conclude to take over the plant and to go into the business of furnishing

gas to its customers. By the terms of its existing charter the Louisville Gas Company is required to furnish illuminating gas, of a fixed candle power, at a rate not to exceed $1.35 per 1,000 cubic feet. This price, however, has been reduced from time to time, so that illuminating gas furnished by the Louisville Gas Company is now selling at the price of $1.20 per 1,000 cubic feet, with a twenty cents discount for prompt payment, leaving the net price of $1 per 1,000 cubic feet. By its present charter the Louisville Gas Company is required to sell non-illuminating or fuel gas at a price not to exceed fifty cents per 1,000 cubic feet; but as the Louisville Gas Company had only one system of pipes, it could, of necessity, furnish only one kind of gas either for illuminating purposes, or for fuel. Accordingly, the charter of the Louisville Gas Company was amended so as to make it optional with the company to furnish non-illuminating or fuel gas. Since this amendment, the Louisville Gas Company has furnished its illuminating gas for heating purposes at eighty cents per 1,000 cubic feet, with the discount, which brings the net price down to seventy-five cents per 1,000 cubic feet. In consideration of the various restrictions upon the price of its product, and of certain duties imposed upon that company, the Louisville Gas Company was given the exclusive right to furnish illuminating gas, it being provided, however, that the exclusive feature of the charter should not prevent the legislature from permitting other companies to furnish natural gas. Consequently, in 1885, the Kentucky Fuel Gas Company was chartered, for the purpose of furnishing artificial, fuel or heating gas; and in 1888 the Kentucky Rock Gas Company was chartered, for the purpose of furnishing natural gas to the city of Louisville. These two last-named franchises passed under the control and ownership of the defendant, the Kentucky Heating Company. Shortly thereafter, the Louisville Gas Company brought suit to enjoin the Kentucky Heating Company from selling natural gas for illuminating purposes, and natural and artificial gas for heating purposes. The final judgment in that extended litigation determined that the Kentucky Heating Company had the right to furnish natural gas for either illuminating or heating purposes, and mixed gas for heating purposes only. Kentucky Heating Company v. Louisville Gas Company, 23 Ky. Law Rep., 730, 63 S. W., 751. The price originally charged by the Kentucky

Heating Company for natural gas was much lower than that charged by the Louisville Gas Company for artificial heating gas; but, as the supply of natural gas diminished, the Kentucky Heating Company was compelled to manufacture more of its heating gas, with the final result that its price was raised to a net price of sixty-five cents per 1,000 cubic feet. Neither the charter of the Kentucky Rock Gas Company nor the ordinance of the city of Louisville, fixed a price at which that company should sell its product; and the same was true as to the charter of the Kentucky Heating Company.

In a recent action between the city of Louisville and the Kentucky Heating Company, it was determined that the Kentucky Heating Company's franchise to use the streets of the city of Louisville for supplying its product, had expired on August 11, 1908; but in the same judgment it was further held that under section 3037D, of the Kentucky Statutes, the city of Louisville must offer for sale a franchise of a character similar to that heretofore held by the Kentucky Heating Company before the city would be permitted to exclude that company from the use of its streets.

It will thus be seen that as to the gas situation in the city of Louisville, the franchise of the Kentucky Heating Company has expired, and that of the Louisville Gas Company will expire within less than six years. Under this state of affairs, the Mayor and the General Council of the city of Louisville deemed it incumbent upon them to take some action which, in their opinion, would be best for the citizens of Louisville. One of the principal benefits which they have sought to obtain in readjusting and continuing a gas franchise for the city of Louisville was the introduction of natural gas into the city from the natural gas fields of West Virginia, which, by most experts in that line, are thought to contain the largest supply of natural gas in this country. It is estimated that it will cost not less than three million dollars to pipe natural gas from West Virginia to Louisville.

Turning now to the electric light situation in Louisville, we find it to be substantially as folows: The use of electricity for lighting purposes upon a large scale, and particularly for lighting of streets and public places, is of comparatively recent date; and when the Louisville Gas Company found that electric light was rapidly taking the place of gas light, it procured an amendment to its charter authorizing it to engage in the business of

furnishing electricity for light and power, which it was permitted to do, either directly or through the purchase of stock of companies having the charter power to furnish electricity. Acting under this authority, the Louisville Gas Company became the owner of a majority of the stock of the Louisville Lighting Company, which owned a franchise granted prior to the adoption of the present Constitution, empowering it to erect its poles and lines along the highways of the city of Louisville, and without limit as to time, or, as to price. The franchise of the Louisville Lighting Company is, however, in no respect exclusive; and, since the adoption of the present Constitution in 1891, the city of Louisville has sold certain other franchises, authorizing the buyers to manufacture and sell electricity for heat, light and power. Two of these franchises were restricted to very narrow areas—one known as the Campbell Electric Company franchise was used in connection with the ownership of the Fifth Avenue Hotel, and extended through a single block; while the other franchise owned by the Geo. G. Fetter Lighting & Heating Company, embraced only a few blocks in the central or business portion of the city. In 1907, however, a much larger franchise was sold to the Kentucky Electric Company. This franchise required the purchaser to be ready to supply a district covering approximately a square mile, and to be ready to serve outlying districts if and when a certain profit should be guaranteed to it. By the terms of this franchise the price of electricity for lighting was fixed at a maximum of nine cents per k. w. h., and for power at a maximum of four cents per k. w. h.

Section six of the franchise bought by the Kentucky Electric Company, reads as follows:

"Section 6. The company shall not sell out to, make joint stock with, or pass under control of any competing company, nor shall it by any device enter into any arrangement which will prevent bona fide competition in the furnishing of electricity, and in case the company shall violate this section, the franchise herein granted shall become void."

The Kentucky Electric Company built an extensive plant, and has ever since been engaged in supplying electricity to consumers in a large district in competition with the Louisville Lighting Company. These competitive conditions have existed between the Louisville Lighting Company and the Kentucky Electric Company

for some years, and necessarily led to a decided reduction in the price of electricity to those consumers who were within the competitive district. As above stated, however, the Louisville Lighting Company is not restricted as to the price it shall charge, while the Kentucky Electric Company is restricted by its franchise to a maximum of nine cents for light, and to four cents for power. In many cases electricity is now furnished to large consumers, by both companies, at much less than the maximum rates of the Kentucky Electric Company.

"H. M. Byllesby & Company" is a corporation engaged in the business of buying and operating public utility companies, and especially gas and electric light companies. Until July, 1912, the city of Louisville owned 9250 shares, or not quite one-third of the capital stock of the Louisville Gas Company. During the year 1912, "H. M. Byllesby & Company" bought from individuals a very large proportion of the stock and from the city of Louisville in the Louisville Gas Company. It thereby acquired a controlling interest in that company. "H. M. Byllesby & Company" also acquired the stock or property of the Campbell Electric Company, and of the Geo. G. Fetter Lighting & Heating Company. The result was, that at the time of the passage of the ordinances which are the basis of this controversy, in March, 1913, "H. M. Byllesby & Company," or those associated with it, owned substantially all the stock of the Louisville Gas Company, which company in turn owned a majority of the stock of the Louisville Lighting Company. Furthermore, H. M. Byllesby & Company and its associates own substantially all of the minority stock of the Louisville Lighting Company, as well as the stock in the Campbell Electric Company and in the Fetter Company.

In handling the situation presented by the expiration of the franchise of the Kentucky Heating Company, and the approaching expiration of the franchise of the Louisville Gas Company, the Mayor of Louisville conceived the idea that it would be of great public advantage to bring about (1) the introduction of natural gas into the city of Louisville; (2) at the same time to fix the price at which this gas should be sold; (3) bring about a reduction of the price to be paid by the city of Louisville for its public lighting; and (4) a similar reduction to private consumers for electricity for light and power. After H. M. Byllesby & Company and its

associates had bought the stock of the Louisville Gas Company from the private owners thereof, and before it had bought the stock of the city of Louisville in said company, the Mayor came to the conclusion that "H. M. Byllesby & Company "was about to buy the stock of the Kentucky Electric Company in violation of section six of the franchise of that company, which expressly prohibited it from selling out to a competing company, as above set forth. The Mayor, therefore, caused a suit to be instituted on June 7, 1912, in the name of the city against the Kentucky Electric Company and sundry defendants, and asked, by way of final relief, that by no device of any kind should the Kentucky Electric Company pass under the control of its competitor, the Louisville Gas Company which owned a majority of the stock in the Louisville Lighting Company, or to any one owning or controlling said companies. That suit was successful in the circuit court, and a decree was entered pursuant to the prayer of the petition. A motion was timely entered for a rehearing and that motion was submitted, but had never been disposed of at the time this action was bought.

Subsequently, in July, 1912, as above pointed out, the city of Louisville sold its stock in the Louisville Gas Company to H. M. Byllesby & Company for $150.00 per share, aggregating about $1,387,500, which has been paid to the city.

As a result of prolonged negotiations between the city of Louisville and H. M. Byllesby & Company, the two ordinances in question, dealing with the future gas and electric situation in Louisville, were passed and approved in March, 1913; and it is the carrying out of the purposes of those ordinances that this action seeks to enjoin. It becomes necessary, therefore, to state as briefly as may be possible, the leading provisions of said ordinances, in order that the objections of the plaintiffs thereto may be fully understood.

The first ordinance creates a franchise for the distribution and sale of natural gas, manufactured gas, and mixed gas for heat and lighting and other purposes. The purchaser, who is styled the grantee in the language of the franchise, is authorized to use the public ways of the city for the purpose of laying and operating a system of mains and pipes, ample provision being made for the restoration of the streets that may be opened in the course of the work.

The sixth section requires that the grantee shall, within sixty days after the acceptance of the ordinance, begin and continue to lay a main line or lines of pipe from the most available source of supply of natural gas in West Virginia to the city of Louisville, and that said main line shall consist of continuous piping capable of withstanding a pressure of 350 pounds per square inch, and of a size and capacity for supplying twelve million cubic feet of gas per day to said city. Said sixth section further provides that said grantee shall complete said line or lines of pipe within one year from the passage and acceptance of the ordinance, and shall immediately thereafter commence to supply natural gas to consumers in said city up to the capacity above mentioned, and that said supply of twelve million cubic feet per day shall not be reduced by reason of any connections with said pipe being made between the city of Louisville and the source of supply. And for the purpose of securing the completion of said line, said sixth section further provides that the grantee shall execute a bond to the city of Louisville, with good surety, in the sum of $25.000.00.

The seventh section requires a further bond of $50,-000 from the grantee for the faithful performance and discharge of all the obligations imposed by the ordinance, including the obligation imposed by section six above quoted.

By section eight the quality of the natural gas, or natural and manufactured gas, or manufactured gas to be furnished, is required to be not less than seven hundred British thermal units to the cubic foot; and the pressure at no time shall be less than three ounces nor more than twelve ounces to the square inch at the point of consumption. These facts are to be ascertained by the gas inspector of the city of Louisville, and in case the quality of gas furnished shall, in any month, for an aggregate period of seventy-two hours, fall below the standard above fixed, then the bills for that month, of all consumers, shall be reduced directly in the proportion that the gas furnished falls below the quality of the gas contracted for, as above specified.

Section nine requires the grantee to furnish, at his own expense, service pipes from his mains to the property lines; and, at the grantee's expense to supply, place and maintain all gas meters, which shall be of a standard make, and which shall, at all times, be subject to a reasonable system of inspection to be provided for by

ordinance of the city of Louisville. Section nine further provides for the employment of a competent chemist or gas inspector by the city of Louisville to inspect meters, and to test the pressure and quality of the gas furnished by the grantee at least once a day, and to analyze the gas furnished for added dilutents or impurities.

Section ten of the ordinance fixes the maximum price at which the grantee of the franchise shall furnish gas to consumers for light, heat and other purposes, after natural gas is first furnished as above required. This maximum price is fixed by a sliding scale, beginning with forty cents for the first one hundred cubic feet per month, and ending with $1.33 for two thousand cubic feet per month. All additional gas over the first two thousand cubic feet per month shall be furnished at a rate not exceeding 38.88 cents per thousand cubic feet, and consumers are allowed a discount of ten per cent. for prompt payment. By this sliding scale all gas in excess of two thousand cubic feet per month is to be furnished at a net price of 35 cents per thousand cubic feet. And, in order to secure equality of rate to all consumers alike, section ten contains this further povision:

"The grantee may also make special contracts with consumers at rates based upon the amount of gas used and the conditions of the contract, which special rates may be less than those charged to consumers taking a small amount of gas or taking gas under different conditions, but said special rates shall be the same to all consumers using a like amount of gas under the same contract conditions.

"A schedule of such special rates and contract conditions shall be filed with the Board of Public Works and each and every change therein shall also be filed with the Board of Public Works and be open to public inspection. But if the demand from special rate consumers threatens the general supply the grantee may shut off the supply from special rate consumers in whole or in part and if the grantee fails or refuses to do so the General Council may by ordinance require the grantee to do so."

Section eleven is administrative in its features, and reserves to the city the right of making changes and extensions of the public lighting service.

Section twelve recites that the object of the franchise created is to make available for the people of Louisville

natural gas at the rate commensurate with the cost of natural gas to the people of other cities similarly situated, and below the cost of manufactured gas; and requires the grantee to take all reasonable precautions and measures necessary to furnish natural gas during the life of the franchise. It further provides, that in the event the grantee shall, through no fault of his own, be unable to supply natural gas in sufficient quantities to meet the demand for same, and it shall become necessary to use a material quantity of manufactured gas, the rate for such mixed or manufactured gas shall be a reasonable rate, to be fixed by the General Council, which the grantee binds himself to accept. The thirteenth, fourteenth and fifteenth sections all contain administrative features relating to the operation and construction of the grantee's plant, and are not made the grounds of any objection.

The sixteenth section authorizes the grantee to acquire the ownership, use or control, by purchase or otherwise of the plant of the Louisville Gas Company and of the Kentucky Heating Company, the last clause thereof reading as follows:

"And the right of the city of Louisville to purchase the property of the Louisville Gas Company at the expiration of the charter of said Louisville Gas Company is reserved, but said right is deferred until the expiration of this franchise if the property of the Louisville Gas Company is used under this franchise as set forth above."

The seventeenth and eighteenth sections are administrative in their nature, and need no special comment.

Section nineteen provides that the franchise created by the ordinance is subject to the exclusive privilege in the charter heretofore granted to the Louisville Gas Company; while section twenty limits the franchise to a period of twenty years, as required by the Constitution.

By section twenty-one the city is allowed to acquire the plant of the owner of the franchise at the expiration of its term, and prescribes the procedure to be taken for that purpose.

Section twenty-two provides that the city gas inspector, or other agents or inspectors to be appointed by the Mayor, shall have the right to examine the books, papers, contracts, obligations and agreements of the grantee, and also all of its physical property and equipment which it may use in the operation of its business.

Section twenty-three of the ordinance reads as follows:

"Nothing in this ordinance contained shall be construed as exclusive or as preventing the city of Louisville from granting a like franchise or privilege to any other person, firm or corporation."

The remaining four sections of the ordinance provide for its advertisement, sale, up-set price, and forfeiture in case the successful bidder should fail, within forty days after his bid has been accepted, to comply with the provisions of the ordinance.

Turning now to the other ordinance, which is commonly called the "Contract Ordinance," it will be seen that its preamble describes it as an ordinance authorizing the Mayor to enter into a contract with "H. M. Byllesby & Company" with reference to certain public utility companies operated in the city of Louisville, naming them. The ordinance does not content itself with authorizing a contract along general lines, but sets out *verbatim* the contract which the Mayor is authorized to make. We have, therefore, in advance, the terms of the proposed contract. By its preamble it recites that the city of Louisville is desirous of obtaining for the use of its citizens a larger supply of natural gas, and to secure for its citizens the benefits to be derived from obtaining such natural gas at a price lower than the cost of a manufactured gas, and for that purpose it intends to offer for sale the franchise hereinbefore examined at length, providing for furnishing such a supply of gas. It further recites that "H. M. Byllesby & Company" controls a majority of the stock of the Louisville Lighting Company, and is desirous of obtaining the physical properties of the Kentucky Electric Company, and is willing to bid for the natural gas franchise and to bring natural gas to Louisville and furnish the same to its citizens, and that the city of Louisville is desirous of fixing a maximum rate at which electricity shall be furnished to the city of Louisville. In consideration of the privileges therein granted to "H. M. Byllesby & Company," and of the permission of the city of Louisville to H. M. Byllesby & Company to acquire the physical properties of the Kentucky Electric Company, and operate the same in conjunction with the Louisville Lighting Company, the city of Louisville on the one hand, and "H. M. Byllesby & Company" on the other, agree in substance as follows:

1. The city will create and forthwith offer for sale a franchise for the furnishing of natural gas and manufactured gas in the form above given.

2. The city consents that "H. M. Byllesby & Company" may acquire the capital stock and property of the Kentucky Electric Company, and in the event of such acquisition, the city releases the Kentucky Electric Company its stock and its property from the prohibitions contained in section six of the franchise of that company, which prohibits it from selling out to any competing company, and which has been heretofore copied in full in this opinion; and,

3. The city further agrees to dismiss the action hereinbefore referred to, in which it had enjoined the Kentucky Electric Company from selling out to "H. M. Byllesby & Company," and which was then pending upon a motion for a re-hearing; but that it would not do so until "H. M. Byllesby & Company," or some corporation controlled by it, became the purchaser of the natural gas franchise provided for, and executed the bonds in the franchise provided for, and executed the bonds in the sum of $300,000, as required by sections six and seven of the franchise.

Upon its side, "H. M. Byllesby & Company" agree (1) to bid the up-set price of $25,000 for the natural gas franchise; (2) in the event it should acquire the same, to carry out the terms of the franchise and bring natural gas to the city of Louisville and furnish the same as therein provided; and (3) to cause the Louisville Lighting Company, in the event that company acquires the property of the Kentucky Electric Company, or to cause any corporation which shall acquire the franchise or property of both these companies, to furnish electricity for lighting and power purposes to the inhabitants of the city of Louisville at a price not to exceed the rate set out in the ordinance. Those rates are specifically set forth, and are upon a sliding scale, the highest price being 7.61 cents net for quantities under 500 k. w. h., and 4.75 cents net for quantities above 500 k. w. h., and power at a maximum of four cents.

Section three of this ordinance has a provision similar to that contained in the gas ordinance requiring all rates to be uniform for equal service, and requiring the rates to be filed with the Board of Public Works and open for public inspection.

There is a further provision that the company shall furnish to the city of Louisville street lamps and elec-

tricity therefor at a price not to exceed $60 per lamp per year where the current is suplied from an underground conduit, and, $56 per lamp per year where the overhead current is supplied.

The city uses 226 lamps which are supplied from an underground conduit, and 2539 lamps from an overhead current.

The ordinance then contains these provisions:

"The above rates regarding street lamps are based upon current consumption and the cost and maintenance of fixtures and such changes or regulations may be made from time to time as may give the city the advantage of any inventions or improvements.

"Third. The city of Louisville reserves the right to make reasonable regulations of rates for the use of electricity and for lamps for both private consumers and municipal purposes and the captial stock or bond issue of said company shall not be considered in fixing said rates."

The remaining provisions of this ordinance are not material to this discussion.

The result of these two ordinances as to franchises and rates, when compared with the present situation in Louisville, may be summarized as follows:

The city is now paying $67 per lamp per year for public lighting, or an aggregate of $185,255.00. At the new rates of $60 and $56 per lamp per year, it will pay $155,-744 for the same service, making an approximate saving of $30,000 per year for this particular service. The consumers of gas are now paying a dollar per 1,000 cubic feet for illuminating gas, and for heating gas, 75 cents to the Louisville Gas Company, or 65 cents to the Kentucky Heating Company. On the other hand, natural gas is to be furnished under the proposed ordinance at a maximum net price of 35 cents per 1,000 cubic feet in quantities of 2,000 cubic feet per month, and on a sliding scale for smaller quantities. This natural gas can be used for illuminating purposes through the medium of mechanical appliances, like the Welsbach Burner; and while it is not practicable, or perhaps not possible to now estimate the reduction or the saving to the people in the use of natural gas, it is fair to assume that it will be substantial. Defendants estimate the saving to the consumers will be more than a million dollars annually.

The price for electric lighting to the smallest consumer will be 7.60 cents, whereas, under the Kentucky

Electric franchise 9 cents can be charged; and for consumers of more than 500 k. w. h. the price will be 4.75 cents, a saving of nearly one-half from the maximum price under the Kentucky Electric franchise.

As before stated, the Louisville Lighting Company is not now restricted in its charge for electricity.

Furthermore, the city reserves the right, should natural gas fail, to fix the price at which manufactured gas shall be sold, and it further reserves to itself the right to fix the price of electric service, the rates prescribed in the ordinance being maximum rates, and not binding upon the city if it should turn out that they are unreasonably high.

In addition to all this, the city is at liberty at any time, to grant other franchises, either for the furnishing of gas or for the furnishing of electricity, and it reserves the right, which it now has, of buying the gas plant at the expiration of the franchise.

It has been suggested in argument that the question here presented is one of power only in the General Council of the city of Louisville, and that judicial tribunals are not concerned with the results arising from exercise of an existing power. That is true, and the plaintiffs have rested their argument, as they necessarily must upon the want of power and authority in the General Council of the city of Louisville to enact these ordinances, or to authorize the contract above referred to; but, in order to fully understand the law questions involved, it was deemed necessary that the foregoing extended statement of facts should be made. These facts are fully set forth in the record and it is upon those facts, and the law applicable to them, that they press this suit. It is to be remembered, however, that courts are interpreters and not makers of the law; it is not the province of the courts to usurp the functions of the legislature or the General Council, by questioning the wisdom of their authorized acts. If the General Council had the power to enact these ordinances, the discussion is ended, regardless of our private opinion as to their wisdom or merit.

An ordinance passed by a municipality cannot be held invalid upon any other ground than its illegality. It is not within the province of this court to say that a valid ordinance is unwise or impolitic; those questions are to be addressed solely to the General Council.

In Wells v. Town of Mt. Olivet, 126 Ky., we said:

"When an ordinance is assailed upon the ground that it is illegal, unfair, unreasonable or oppressive, the person complaining will ordinarily be required to point out specifically in what respects the ordinance is unreasonable, unequal or oppressive as applied to the facts of the case relied on by him. * * *

"When the aid of the court is invoked to declare a municipal ordinance void, it must clearly appear that it is inherently violative of the law or some of the well-settled pinciples that are generally recognized as limitations upon the power of municipalities in the enactment of ordinances, or, if the ordinance is not inherently defective as coming within these inhibitions, then the person attacking it must affirmatively show that as applied to him it is unreasonable, unfair or oppressive. State Consolidated Traction Co. v. Elizabeth, 32 L. R. A., 170."

Cooley on "Constitutional Limitations," says:

"The courts must assume, that legislative discretion has been properly exercised. If evidence was required it must be supposed that it was before the legislature when the act was passed; and if any special finding was required to warrant the passage of the particular act it would seem that the passage of the act itself might be held equivalent to such finding." (7th Ed., p. 257).

In Kittinger v. Buffalo Traction Co., 160 N. Y., 377, the Supreme Court of New York speaking through Chief Justice Parker, said:

"And the same presumption that legislative action has been devised and adopted on adequate information and not under the influence of corrupt motives will be applied to the discretionary action of municipal bodies and of a state legislature, and will preclude in the one case as in the other all collateral attacks."

In Slade v. Lexington, 121 S. W., 621, this court, speaking through Judge Hobson, said:

"The authorities are practically agreed that an ordinance defining and granting a franchise is the exercise of a legislative function, and that a court of equity will not enjoin a council in the exercise of its legislative functions. There is sound reason for this; for, if the legislative authority of a city may be enjoined from exercising its judgment in all cases in governmental matters where it is insisted by the complainant that the council is about to do something which it has no authority to do, great confusion in the government of cities would en-

sue, and the distinction between legislative and executive functions would amount to little. The Constitution forbids the judicial department from interfering with the Legislature in its functions. The purpose of the separation of the government into three departments was to preserve the independence of each. If an ordinance defining and granting a franchise may be enjoined, then all legislative matters before the council may be controlled by injunction, such as the question of high or low license, and fixing of boundaries of the city, the erection of buildings within the city, and the like, wherever it is conceived that the council is about to pass some ordinance without authority to do so. If such were the practice, the dignity of the council would be entirely destroyed, and the office would be so burdensome that many persons would shrink from assuming it."

Having in view this well established doctrine as to the province of the courts, we will proceed to examine the legal questions presented by this record; and in doing so, we will follow the line of argument formulated by counsel for plaintiffs, in six propositions, wherein they contest as follows:

1. The ordinances are in violation of section 2777 of the Kentucky Statutes, which provides that no ordinance shall be altered or amended in any way except by repealing it:

2. The ordinance creating the gas franchise is in direct violation of section 3037D of the Kentucky Statutes:

3. The first ordinance is illegal in that it undertakes to disable the city from exercising its right vested in it by the General Assembly to purchase the plant of the Louisville Gas Company at the expiration of its charter:

4. The second ordinance is illegal for the reason that in it the city of Louisville undertakes to commit the General Council of the city of Louisville, in advance, to enact a certain ordinance creating certain maximum rates for electricity and restraining its power to reduce such rates:

5. The purchase of the gas franchise under the first ordinance by "H. M. Byllesby & Company," which would inevitably be the purchaser thereof, and the carrying into effect of the contract between "H. M. Byllesby & Company" and the city of Louisville," would in effect and re-

ality give to ''H. M. Byllesby & Company'' a monopoly of manufacturing and distributing electricity and gas and of distributing natural gas in the city of Louisville, contrary to the Constitution, laws, and well-settled public policy of the Commonwealth of Kentucky; and

6.   The ordinances violate section 164 of the Constitution in that they do not contemplate the granting of a franchise after due advertisement, the public receiving of bids, and the awarding of such franchise to the highest and best bidder.

1.   Section 2777 of the Kentucky Statutes, is a part of the charter of cities of the first class, and reads as follows:

''No ordinance shall be passed until it shall have been read in full in each board and free discussion allowed thereon, and no ordinance shall pass both boards on the same day.   No ordinance shall embrace more than one subject, and that shall be expressed in its title.   No ordinance shall be altered or amended in any way except by repealing it.''

Counsel for plaintiffs rested the oral argument chiefly upon the first sentence of said section, which provides that no ordinance shall be passed until a free discussion has been allowed thereon, and that no such discussion was offered to the members of the General Council in this case, since the ordinances were passed by the Board of Councilmen the same day on which they were introduced.   But certainly it is not for this court to say how much discussion the General Council shall allow upon any particular ordinance, or that parliamentary rules of procedure shall be applied otherwise than under the ordinary rules of such procedure.

In State v. Superior Court of Milwaukee County, 105 Wis., 651, the court said:

''It is enough to say that a court of equity has no place in the chamber of the common council to supervise or superintend the proceedings of that body while engaged in the exercise of legislative or discretionary functions.''

If the record shows that the law governing the enactment of ordinances was complied with, it is not for the courts to say that the law has not been complied with. In the case at bar all the technical requirements of the procedure in the passage of ordinances were complied with.   They passed the lower board on March 25th, and the upper board on March 27th, after amendment, in

two respects. The amendments necessitated a reconsideration by the lower board, which passed the ordinances on the 28th. The General Council had the exclusive right to say whether an hour or two hours, was sufficient time for a free discussion of the ordinance. In the case at bar the vote of the Board of Aldermen was unanimous, while the vote in the Board of Councilmen contained only two votes against the ordinances. The minutes further show that the two objecting members of the Councilmen addressed that board at length, setting forth their views in opposition.

Furthermore, it is a well known fact that questions of legislation are not only frequently, but generally are discussed in advance and changed so as to meet new views suggested by the discussion, and bills in conformity therewith are drawn by a committee before they are introduced into the legislative body; and in this way members obtain all the knowledge of the proposed legislation they could otherwise obtain, and are prepared to vote without further discussion.

Plaintiffs further contend that under the last provision of section 2777, section six of the Kentucky Electric Company's franchise, which prohibits it from selling out to a competitor, should have been formally repealed in order to eliminate it, and that it could not have been eliminated in any other way than by a surrender of the franchise of the .Kentucky Electric Company, by a repealing of the ordinance by the city, and by the enactment of a new franchise ordinance in which section six would not have appeared. We have been cited to no authority in support of the construction of the statute here insisted upon; and it being conceded, as it must be, under the authority of the decision of this court in Louisville Home Telephone Co. v. City of Louisville, 130 Ky., 626, that the city and the Kentucky Electric Company could, by agreement, eliminate the provision in question, we see no reason why they should not agree in the manner here adopted. The purpose of the statute was to prevent loose legislation of doubtful meaning, rather than to control parties in the exercise of their individual rights under existing ordinances.

Evidently section 2777 was not intended to affect the private rights of parties obtained under ordinances, since the right to change or annul those privileges by agreement is affirmatively fixed by the decision in the Louisville Home Telephone Company case.

2. It is further insisted that the ordinance creating the gas franchise is in direct violation of section 3037D, of the Kentucky Statutes. That section is a part of the Act of 1904 amending the charter of cities of the first class, and provides, among other things, for the sale of a new franchise upon the expiration of a former franchise, and that the new franchise shall be similar to the original franchise. This objection is based upon the fact that the circuit court has determined that the franchise of the Kentucky Heating Company has expired; that said company now has no franchise, and that the statute which requires the city to sell "a similar franchise" is not satisfied by a sale of a natural gas franchise. The franchise of the Kentucky Heating Company was for furnishing "natural gas for fuel and heating purposes," while the franchise offered under the new ordinance is for the sale of "natural gas, manufactured gas and mixed gas, for heating and lighting and other purposes." There is a complete answer to this contention. In the first place, the statute requiring a sale of a similar new franchise was evidently passed for the benefit of the owner of the expiring franchise, and he only can complain if the city offers a different franchise. It will not be contended that the city may not offer as many different franchises as it pleases, and it may yet offer a franchise in the exact terms of the original franchise, held by the Kentucky Heating Company. If the Kentucky Heating Company should choose to require the city to carry out the judgment of the chancellor, by offering a franchise similar to its expired franchise, the city will have to do so, and its offer of the present franchise for the sale of natural and artificial gas will not stand in the way. The franchise offered in the proposed ordinance, is in no sense exclusive; on the contrary, section 23 of the proposed franchise, above quoted, expressly provides that nothing in said ordinance shall be construed as exclusive, or as preventing the city from granting a like franchise or privilege to any other person, firm or corporation; and, of course, if it can grant a like franchise, it can certainly grant a different franchise.

3. By section 19 of the present charter of the Louisville Gas Company the city has the right to buy the plant of the Gas Company upon the expiration of its charter on January 1, 1919. The same provision is found in section 3 of the Act of March 20, 1902, which

is now contained in subsection 3 of section 2783A of the Kentucky Statutes as a part of the charter of cities of the first class.

As above stated, section 3037D of the Kentucky Statutes, being a part of the Act of March 22, 1904, and embraced in the charter of cities of the first class, provides for the sale of a new franchise upon the expiration of a former franchise, and for a purchase of public utility plants by cities of the first class. Conceding that these statutory provisions have not divested the city of Louisville of its power to purchase the plant of the Louisville Gas Company upon the expiration of its original charter, nevertheless the city of Louisville had the right, under the authority of Louisville Home Telephone Co. v. The City of Louisville, *supra*, to change the contract as it did, by postponing the right to buy the plant until the expiration of the present charter. If a city has the right to annul a contract provision in a franchise, as was decided in the Louisville Home Telephone Company case, it certainly has the less important right of postponing that privilege until the expiration of the new charter. The authorities cited by plaintiffs upon this point, are to the effect that a municipality cannot, in the absence of express legislative authority, make contracts or pass by-laws which would cede away, control or embarrass its legislative or governmental powers, or which would disable it from performing its public duties. 1 Dillon's Munic. Corp., Sec. 245. That proposition is surely sound. But that class of cases is not controlling here, since the right to buy the gas plant is a contract right which may be dealt with like any other property right. No legislative or governmental power is abridged by the proposed postponement of the right to buy the plant. Moreover, section 21 of the new franchise gives the city the right to buy not only the existing plant, but all the new plant that may be installed under the new franchise. If the time had now arrived for the city to exercise its option to buy, can it be doubted that it would have the right and the power to bargain with the Gas Company for an extension of this option? We think not. Really, plaintiffs' contention amounts to this: the city can make no contract which looks to the future for its fulfillment; and, of course, that means the city can make no executory contract.

But in Slade v. City of Lexington, 141 Ky., 214, it was held that a contract by a city for the renewal of a waterworks contract at the end of twenty-five years, was

valid and enforceable. Being a mere contract right and not within the rule applicable to governmental powers, we see no reason why the city may not deal with it, as with any other property right.

4. Is the contract ordinance illegal because the city therein undertakes to commit the General Council in advance, to enact a certain ordinance creating certain maximum rates for electricity, and restricting its powers to reduce such rates?

Plaintiffs insist that it is, and rely upon the line of cases last above referred to. It must be admitted that if the city had the power to pass the ordinance creating the new franchise, without this ancillary contract, its failure to pass the contract ordinance now objected to, would not invalidate the franchise ordinance. Neither would it invalidate the contract ordinance in which it is embraced. The General Council would have the right to pass the ordinance, to repeal it if passed, and to provide other reasonable rates; and we fail to see how the mere fact that it now proposes in advance to prescribe maximum rates to which Byllesby & Company agree to abide, invalidates the ordinance.

Plaintiffs rely upon a line of cases which hold that a city council has no power to embarrass itself in the future exercise of its legislative discretion, by agreeing in advance to fix a scale of maximum rates for electricity. That, however, is a-begging of the question, since the ordinance does not bind the city as to the future exercise of its legislative discretion in this respect; it merely prescribes maximum rates for the present, which Byllesby & Company agrees to accept as reasonable. As before stated, it does not prevent the city from making other reasonable rates. This is easily seen from an examination of the ordinance.

By section B of the Contract Ordinance Byllesby & Company agrees to abide by the terms of an ordinance fixing the maximum price for electricity as therein set out, whenever the city passes such an ordinance. At the present the franchise of the Louisville Lighting Company contains no restriction upon rates; it can charge what it pleases, or can get. The franchise of the Kentucky Electric Company fixes a maximum of 9 cents for light and 4 cents for power. Under this state of affairs, the city may pass an ordinance fixing the maximum rates of both companies, provided they be reasonable and produce a fair return upon the investment; and under the

proposed contract both companies agree that they will not contest the prescribed rates, if they be adopted by the city.

But in the third section of clause D of the contract the ordinance further expressly provides:

"The city of Louisville reserves the right to make reasonable regulations of rates for the use of electricity, and for lamps for both private consumers and municipal purposes, and the capital stock or bond issue of said company shall not be considered in fixing said rates."

It is plain therefore that there is no restriction upon the city in fixing rates for electricity, except that imposed by law—that they be reasonable. The proposed rates are an advantage to consumers of electricity in that the contract binds Byllesby & Company to their reasonableness; it does not, however, prohibit the city from making lower rates.

This objection is based upon a misconception of the effect of the contract ordinance, and is without substance.

5. Would the purchase of the proposed franchise by "H. M. Byllesby & Company" confer upon that corporation a monopoly of manufacturing and selling electricity and gas and of distributing natural gas in Louisville in violation of the statute, or the public policy of the State?

The public policy of a State is expressed in its Constitution and statutes, and in its common law as found in the opinions of its court of last resort. If the Constitution or statutes speak upon a subject, the public policy of the State is necessarily fixed to that extent. And when the legislature speaks and the courts construe that declaration, we certainly have a conclusive rule as the public policy of the State upon the subject thus treated. We cannot agree that the act of a municipality may have the sanction of the law and yet be against public policy. When the legislature has spoken, we cannot look to general expressions in opinions of this court as laying down a rule of public policy in oppostion to that contained in the statute. We have various statutory provisions relating to monopolies. Under section 555 of the Kentucky Statutes two or more corporations of this State, may consolidate into a single corporation; while section 769 confines the acquisition by one railroad of the franchise of another, to a non-competing line. Section 201 of the Constitution prohibits the consolidation of competing or parallel railroads or like companies.

Section 198 of the Constitution reaches the subject in hand, and provides as follows:

"It shall be the duty of the General Assembly from time to time, as necessity may require, to enact such laws as may be necessary to prevent all trusts, pools, combinations or other organizations, from combining to depreciate below its real value any article, or to enhance the cost of any article above its real value."

In 1890, prior to the adoption of the present Constitution, the legislature dealt with the subject by an act which became sections 3915 to 3941, inclusive, of the Kentucky Statutes, against "Pools, Trusts and Conspiracies." That act forbade the formation of trusts or monopolies without regard to whether they raised or depreciated the price of an article when compared with its real value.

In 1906, however, the legislature amended the statute so as to authorize farmers to combine for the purpose of obtaining higher prices for their products. This statute is known as the "Pooling Statute," and is section 3941a of the Kentucky Statutes. But in the recent cases of Commonwealth v. International Harvester Co., 131 Ky., 556, International Harvester Co. v. Commonwealth, 137 Ky., 674, and International Harvester Co. v. Commonwealth 144 Ky., 403, it was held that under the law of Kentucky as it exists today there is no prohibition against the formation of trusts or monopolies, but that they are liable to a fine if they sell their products above or below their real value, such real value to be fixed by a jury. The law has so stood since 1906, without change by the legislature, and must be accepted as the public policy of the State upon the subject. When properly construed and applied, we do not find anything in Stites v. Norton, 125 Ky., 672, or in Merchants Ice & Cold Storage Co. v. Rohrman, 138 Ky., 530, and kindred cases relied upon by plaintiffs that can take this case out of the operation of the rule laid down by the act of 1906. If the city had the authority to pass these ordinances, there is nothing in the public policy of the State that would invalidate them.

6. Finally, we pass to a consideration of the most difficult question presented by this record: Do the ordinances violate section 164 of the Constitution?

Said section reads as follows:

"No county, city, town, taxing district or other municipality shall be authorized or permitted to grant any

franchise, or privilege, or make any contract in reference thereto, for a term exceeding twenty years. Before granting such franchise or privilege for a term of years, such municipality shall first, after due advertisement, receive bids therefor publicly and award the same to the highest and best bidder; but it shall have the right to reject any or all bids. This section shall not apply to a trunk railway.''

Plaintiffs contend that since the ordinances provide for an advertisement of the sale of the franchise of not less than two weeks, in two specified Louisville daily newspapers, one printed in English and the other in German, there is no ''due advertisement'' such as is required by section 164 *supra*. It is contended that the advertising provision is merely a perfunctory compliance with the constitutional requirement, and does not comply with the spirit of the Constitution. There is no statutory or constitutional provision defining what constitutes ''due advertisement,'' and we are not advised by the plaintiffs as to what would be a compliance with this provision of the Constitution. In the absence of some statutory provision upon the subject, we cannot question the good faith of the General Council in fixing the length of this advertisement at not less than two weeks, in two different newspapers. Lands of debtors are generally sold at judicial sales after an advertisement of ten days; and, while persons might well differ as to what constitutes a ''due advertisement'' either as to the character of the advertisement, or its comprehensiveness and extent, we are not authorized to say that the legislative body of the city has violated the broad discretion here given it. If the framers of the Constitution had intended to circumscribe the power of the General Council in this respect, it would have done so. We have been referred to no authority upon the question, beyond the language of the section as above quoted.

It is further contended, under this heading, that the ordinances are so drawn that ''H. M. Byllesby & Company'' must, of necessity, be the only bidder at the sale of the franchise, and that therefore it cannot be sold to the highest and best bidder, when there can be only one bidder, and no competition. In other words, this objection is based upon the idea that where the franchise is to be sold in such a way as to give an undue advantage to one person over another, there is no competitive bidding upon equal terms, as is contemplated by section 164;

and that the ordinance is void for that reason. This contention is based upon the doctrine laid down by this court in Fineran v. Central Bitulithic Paving Co., 116 Ky., 495. In that case a street in Newport was constructed under an ordinance which required contracts for construction of streets to be let to the lowest and best bidder, and the ordinance provided that the street should be made of "bituminous macadam," a patented composition in the exclusive control of the Central Bitulithic Paving Co. In view of this exclusive ownership it was contended, and this court held, that there could not be a "lowest bidder" within the meaning of the charter; that there could, in reality, be but one bidder, and pointed out the fact that the vice of the ordinance consisted in its requiring the street to be improved with "bituminous macadam," without placing it in competition with other like or equally as good material for such purposes. The Fineran case cited with approval the leading case of Fishburn v. Chicago, 171 Ill., 338, 39 L. R. A., 483, 63 Am. St. Rep., 236, where a Chicago ordinance required a street to be paved with asphaltum to be obtained from "Pitch Lake" in the Island of Trinidad. "Pitch Lake" was in the exclusive control of the Barber Asphalt Co., and for that reason the Supreme Court of Illinois held the ordinance was void, because it prohibited competition in bidding. In the course of its opinion the Supreme Court of Illinois said:

"If it be the judgment of the city council that the most suitable and best materials to be used in any contemplated improvement is the product of some particular mine or quarry, or some substance or compound which is in the control of some particular firm or corporation, the ordinance might be so framed as to make such production, substance, or compound the standard of quality or fitness, and to require that material equal in all respects to it should be so employed. An ordinance making it indispensable that an article or substance in the control of but a certain person or corporation shall be used in the construction of a public work must necessarily create a monopoly in favor of such person or corporation, and also limit the persons bidding to those who may be able to make the most advantageous terms with the favored person or corporation."

See, also, Diamond v. Mankato, 89 Minn., 48, 61 L. R. A., 448.

In the Fineran case, *supra,* we adopted the rule as above announced, and it has never been departed from by this court. Plaintiffs insist the principle there announced is conclusive against the validity of the franchise ordinance, because, as they claim, it gives Byllesby & Company a double advantage in the bidding, either one being sufficient to invalidate it. It must be remembered, however, that the rule does not apply unless the advantage by its terms, excludes other bidders.

The first obnoxious privilege is found in that provision of the gas franchise which requires the purchaser of that franchise to bring gas to Louisville from West Virginia, which it is contended violates the rule laid down in the Fineran case, because it requires the purchaser to furnish gas from a particular field which is owned exclusively by ''H. M. Byllesby & Company,'' and that it therefore necessarily shuts out all other bidders. If this were true the case might come within the doctrine laid down in the Fineran case, *supra,* and in Fishburn v. Chicago, *supra,* and in Diamond v. Mankato, *supra,* and the ordinance might be invalid for that reason. The petition, however, is not broad enough to present the question in the shape contended for by plaintiffs. The allegation of the petition upon this subject is as follows:

'The plaintiffs say that in the states of Virginia, West Virginia and Kentucky there are very extensive areas of territory under which there lies natural gas, which said gas is chemically and physicially available for transportation and use in the city of Louisville for fuel and for lighting purposes; that the defendant, Byllesby & Company, has, so the plaintiffs are informed, by contract through itself or its agents, an option to purchase or lease certain tracts in West Virginia under which tracts such available natural gas exists.''

This language is very far from alleging that Byllesby & Company have a monopoly of the natural gas fields of West Virginia; it merely says that Byllesby & Company has an option ''to purchase or lease certain tracts'' of land, not all of them—under which available natural gas exists. We must assume, therefore, that any prospective bidder is at liberty to supply gas from West Virginia, provided, of course, he has the capital to do so.

And in this connection, it is also insisted that by reason of Byllesby & Company's ownership of the Louisville Gas Company and the Louisville Lighting Company, it is on a much more favorable footing than any

other bidder could possibly be, since it has its plant and mains already in operation, and that for this reason they have an advantage which would make the bidding unequal, unfair, and violative of section 164 of the Constitution. It must be admitted, however, that Byllesby & Company's ownership of the Louisville Gas Company and of the Louisville Lighting Company is an advantage, if it be an advantage, which goes with the ownership of property, or capital. But it does not necessarily exclude other bidders. It is estimated that it will cost perhaps three million dollars to bring to Louisville an adequate supply of natural gas from West Virginia. Of course, a franchise so expensive could not be bought by a person without capital sufficient to operate the franchise; but it cannot be said that this fact would give an exclusive or an undue advantage to the man with capital sufficient to handle the undertaking. The mere statement of the proposition is a sufficient answer to the criticism.

Furthermore, the fact that a gas and electric franchise is drawn so as to cover only territory already occupied by the pipes or wires of an existing company will not invalidate it.

This precise question was before this court in Hilliard v. Geo. G. Fetter Lighting & Heating Co., 127 Ky., 95. In that case the Fetter Company had, under a license from the Board of Public Works built certain underground conduits through which it sold electricity. This court having decided that the license was void, the Fetter Company procured the city to sell an electric franchise, and the ordinance creating the franchise described the location of the underground conduits to be laid in pursuance of its terms exactly as the Fetter Company's conduits were situated. Furthermore, it also prohibited the Louisville Lighting Company and the Kentucky Electric Company from bidding on the franchise. It necessarily followed that the Fetter Company was the successful bidder; and in Kentucky Electric Co., v. Barret, 132, Ky., 717, this court sustained the validity of the ordinance.

See, also, Johnson v. City of New Orleans, 105 La. Ann., 149, Ward v. Seattle, 23 Wash., 1, 52 L. R. A., 369, and City of Newport v. Municipal Light Co., 147 Ky., 776. Under this ruling, the city may hereafter sell another franchise and prohibit the owners of the present franchise from bidding therefor.

The second invalidating privilege which it is claimed Byllesby & Company has to the disadvantage of other bidders, is the agreement on the part of the city to waive in Byllesby & Company the provisions of section six of the franchise of the Kentucky Electric Co., which prohibits it from selling out to a competitor. This objection, in turn, presents two aspects, under plaintiffs' contention; (a) that the prohibition cannot be waived against the consumer, and (b) that, if waived, it confers an insurmountable advantage upon Byllesby & Company, and renders the sale void under the doctrine of the Fineran Case, *supra*.

Of these in their order:

(a) Did the City Council have the power to waive section six of the charter of the Kentucky Electric Company, which prohibited it from selling out to the Louisville Lighting Company, or any other competitor? If this were a case of first impression in this jurisdiction, we might be inclined to give great weight to this contention. The question, however, was put at rest, so far as this court is concerned, by the decision in Louisville Home Telephone Co. v. City of Louisville, 130 Ky., 626. In that case the Home Telephone Company's franchise required it to pay annually to the city the sum of one dollar for every telephone or instrument in excess of 6,000. By agreement between the Telephone Company and the city of Louisville, a new franchise was offered for sale from which the provision above referred to was eliminated, and the telephone rates were materially increased. It was contended that the city and the Telephone Company could not, even by agreement, waive a contract in the franchise which had been made for the benefit of the citizens. This court, however, overruled that contention, and held that it was competent for the Telephone Company and the city to agree to the enactment of an ordinance relieving the Telephone Company of the obligation in its original franchise. This view of that decision was emphasized by the dissenting opinion, which conceded the right of the parties, by agreement, to make the change in the original contract, the dissent being rested upon the ground that it could not do so in the absence of a valuable consideration therefor. As there is ample consideration for the waiver in the case at bar, it would seem that the proposal to abrogate section six under the new franchise is supported by the opinion of the court, as well as by the dissenting opinion, in

Louisville Home Telephone Co. v. City of Louisville, *supra*. We cannot accept plaintiff's view of the law governing this point without departing from the decision in the Home Telephone Case, *supra;* and as that case was maturely considered, we see no sufficient reason why we should not follow it.

In McQuillin on Municipal Corporations, Vol. 3, Sec. 1272, the rule as to a city's power to modify its contracts is stated as follows:

"By consent a municipality may modify a contract. Obviously, the municipality cannot, without the consent of the other party to the contract, modify it. The power to modify a contract on behalf of a municipality generally is vested in the officer or body authorized to make the contract. Unauthorized modifications of contracts by officers without authority will not bind the city. Generally, the common council has power, with the consent of the other party, to modify a municipal contract previously entered into, so as to bind the city. Evidence of a modification need not consist of express acts. The consent of the corporation to modify a contract may be inferred or implied from acts on its part relating to the performance of a contract after it formed the conclusion."

In Arnold v. Pawtucket, 21 R. I., 15, the city had made a contract to furnish water to a certain district for ten years; and prior to the expiration of the ten years, it made a new contract in place of the old one. The question was, could the city make the new contract and abrogate the old one? The court said:

"The point is taken that as the city in May, 1890, exercised the power conferred by the act of incorporation, by entering into a contract with the district to furnish water to the district for ten years from that date, which term will not expire until May, 1900, it thereby exhausted the power conferred upon it until the ten years during which the contract is to run have terminated. There is, however, no limitation in the act of the power to contract; and, in the absence of such limitation, we see no reason, though such powers are usually strictly construed, and though the contracting parties are corporations, why they may not modify an existing contract, or substitute a new one in the place of it, precisely in the same manner as natural persons, provided only that such modification or new contract be reasonable and proper."

In Cumberland Telephone & Telegraph Company v. City of Hickman, 129 Ky., 229, the city sold a telephone franchise conditioned that work upon installing the telephones should be begun within six months and finished within a year. The company was about to forfeit its franchise for failure to perform the conditions, whereupon the City Council extended the time, upon the condition that the maximum charges to subscribers should be less than those fixed in the original franchise. It was contended that this agreement amounted to the granting of a franchise without a sale, and further, that the city had no power to change the contract.

Upon this last point the court said:

"We think it was competent for the city to waive the forfeiture of the franchise because the work had not been begun within six months, in consideration of a reduction of the rates by the owner of the franchise. There was a sufficient consideration moving to the city to support its waiver of the forfeiture; likewise a sufficient consideration moving to the grantee of the franchise to support his agreement to charge patrons within the city, and for whose benefit and welfare the contract had been entered into, a less rate than was originally agreed upon. In doing this, the city granted no new or different right in the use of its streets nor did it abate any of the original consideration. On the contrary, it gave only what it has originally agreed to grant, and got in exchange a better consideration what it had given up was a right to claim a forfeiture—the giving up of which is not the granting of a franchise."

In the late case of the City of Newport v. The Municipal Light Co., 147 Ky., 776, the appellee had, in 1905, acquired a franchise to supply artificial gas for a period of twenty years. In 1910 the city sold a franchise for the exclusive supplying of natural gas, and the new franchise provided that the natural gas might be furnished through the mains then used for the distribution of artificial gas, provided arrangement therefor be made with the owner of the mains, and that such new use should not operate as a forfeiture of the artificial gas franchise. In a suit by the City of Newport to forfeit the franchise for non-user this court overruled the city's contention and sustained the contract. The applicability of the decision to the question before us lies in the fact that the artificial gas company was in a much better position to bid than any other competitor, since it already had its

pipes laid in the streets, and in the further fact that it upheld the right of the purchaser of the franchise to acquire the pipes of the old company.

We conclude, therefore, from these ample authorities that the city had the right to waive the prohibition contained in section six of the Kentucky Electric Company's charter.

(b) It will be remembered the contract ordinance provides that the agreement therein to consent to the purchase of the Kentucky Electric Company by H. M. Byllesby & Company shall not be effective unless that company, or some corporation controlled by it, shall become the purchaser of the natural gas franchise.

Conceding for the sake of the argument that the city had the right to waive the prohibition in section six of the charter of the Kentucky Electric Company in favor of Byllesby & Company, it is nevertheless contended that said waiver rendered the ordinance invalid under the Fineran Case, because it was not waived to every bidder alike.

At first impression the argument seems forceful, but upon a closer examination it would appear to be without merit. It might well be conceded that if the effect of this provision of the ordinance was to give ":H. M. Byllesby & Company" some exclusive privilege or advantage over other bidders for the franchise, the case would come within the doctrine laid down in the Fineran Case above quoted, and the ordinance would be invalid.

Counsel for plaintiffs liken this case to a case where a man offers his horse for sale at public auction, upon the condition that if Jones buys the horse he will give Jones a farm worth a thousand dollars; but that if Smith buys the horse, he is to get nothing beyond what he buys; and it is insisted that in such a case Jones would, in reality, be the only bidder. But the misleading feature of the illustration consists in the radical difference between the legal relations existing between Jones and Smith and the relations existing between the parties in the case at bar. In the case put by counsel, Smith and Jones stood upon equal terms as bidders before the proposition was made to give Jones the farm, and it was the giving of the farm that put them upon an unequal footing. But in the case at bar Byllesby is not upon an equal footing with other purchasers under the present situation, and the abrogation of prohibitive section six in the franchise of the Kentucky Electric Com-

pany will have the effect only of putting him upon an equal footing with other bidders. The reason is plain when we analyze the situation. As it now stands, any person except Byllesby & Company may lawfully purchase the Kentucky Electric Company, and any person, other than Bylesby & Company, can buy both the natural gas franchise to be sold, and the Kentucky Electric Company. But Byllesby & Company cannot do that, since, being the owner of the Louisville Lighting Company, which is a competitor of the Kentucky Electric Company, it is prohibited from buying the latter company by section six of the latter company's charter. In other words, this section puts a prohibition upon Byllesby & Company which other bidders are not required to carry. Other bidders can buy the natural gas franchise and can also buy the Kentucky Electric Company, and neither the city nor any other interested person can prevent them from so doing. They would therefore have the advantage over Byllesby & Company when it came to bid for the natural gas franchise. In order, therefore, to put all parties upon an equal footing, the ordinance provides that in case Byllesby & Company should buy the natural gas franchise, it should, like other bidders, have the right to buy the Kentucky Electric Company; and the provision in the contract ordinance above referred to, which provides that the prohibition of section six should be waived only in favor of Byllesby & Company, instead of being an advantage to it in the bidding, over other bidders, merely puts it upon an equal footing with other bidders. And, this being true, it does not, in any sense, do violence to the doctrine laid down in the Fineran Case, and in the other cases above referred to. It does not make Bylesby & Company the exclusive bidder, like the owner of a patented article, or the owner of "Pitch Lake" asphalt.

It would be no violation of section six, for the owner of the gas franchise to acquire the Kentucky Electric Company's property and franchises, or for the Kentucky Electric Company to acquire the plant and franchises of a gas company; but because Byllesby & Company happens to own the Louisville Lighting Company said section prohibits Byllesby & Company from becoming the owner of the Kentucky Electric Company—thus placing Byllesby & Company under a disability which is attached to no other bidder for the gas franchise. The removal

of the disability from Byllesby & Co., gives it no exclusiveness in the bidding.

But if, in order to put every possible bidder upon an equal footing, the ordinance had provided that the purchaser of the gas franchise might acquire both electric companies without forfeiting the franchise of the Kentucky Electric Company, the same condition of inequality would have existed, because, as Byllesby & Company already own the Louisville Lighting Company, it would have been in a position to buy the Kentucky Electric Company, whereas any other bidder would have been compelled to buy both electric companies, in order to accomplish the same purpose. And, the city having the right to waive the prohibition of section six, there could be no objection to the form of the ordinance, since the bidding would be open to all upon equal terms, although in reality, the same apparent inequality would exist between them.

The provision of the contract ordinance for the dismissal of the injunction suit prohibiting the Kentucky Electric Company from selling out to the Louisville Lighting Company is but a part of the details necessary to remove the prohibition above referred to, and need not be further considered.

We have thus carefully and fully examined every ground relied upon by the plaintiffs in support of the order of injunction, and have reached the conclusion that the ruling of the chancellor cannot be sustained.

The injunction is dissolved.

This opinion is concurred in by Chief Justice Hobson, and Judges Settle, Lassing and Turner. Judge Nunn absent; Judge Carroll not sitting.